**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 21, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF WYOMING,

              Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT
OF AGRICULTURE; UNITED
STATES FOREST SERVICE; TOM
VILSACK, Secretary, United States
Department of Agriculture, in his
official capacity; TOM TIDWELL,
Chief Forester, United States Forest
Service, in his official capacity,

              Defendants-Appellants,

and

BIODIVERSITY CONSERVATION
ALLIANCE; DEFENDERS OF
WILDLIFE; NATIONAL AUDUBON
SOCIETY; NATURAL RESOURCES
DEFENSE COUNCIL; PACIFIC
RIVERS COUNCIL; SIERRA CLUB;
THE WILDERNESS SOCIETY;
WYOMING OUTDOOR COUNCIL,

              Defendants-Intervenors-
              Appellants.

_____

COLORADO MINING
ASSOCIATION,

Nos. 08-8061 & 09-8075

Intervenor-Appellee,

STATE OF WASHINGTON;
MOUNTAIN STATES LEGAL
FOUNDATION; STATE OF
CALIFORNIA; STATE OF
MONTANA; STATE OF OREGON;
CALIFORNIA ASSOCIATION OF 4
WHEEL DRIVE CLUBS; UNITED
FOUR WHEEL DRIVE
ASSOCIATIONS; AMERICAN
COUNSEL OF SNOWMOBILES
ASSOCIATIONS; BLUE RIBBON
COALITION; ALASKA MINERS
ASSOCIATION; UTAH MINING
ASSOCIATION; NEW MEXICO
MINING ASSOCIATION;
NORTHWEST MINING
ASSOCIATION; THE WESTERN
BUSINESS ROUNDTABLE,

Amici Curiae.

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:07-CV-00017-CAB)**

---

James Kaste, Senior Assistant Attorney General, State of Wyoming (Jay Jerde, Deputy Attorney General; Patrick J. Crank, Speight, McCue & Crank, P.C., with him on the brief), Cheyenne, Wyoming, for Plaintiff-Appellee.

John Luther Smeltzer, Attorney, Department of Justice, Environment & Natural Resources Division (David C. Shilton, Attorney, Department of Justice, Thomas Millet, Brian Sonfield, Leslie Lagomarcino, and Vincent DeWitte, Of Counsel, Office of the General Counsel, United States Department of Agriculture, with him on the brief), Washington, D.C., for Defendants-Appellants.

2

James S. Angell, Earthjustice, Denver, Colorado (Andrew Evans Hartsig, Attorney, Earthjustice, Denver, Colorado; Douglas L. Honnold and Timothy Joseph Preso, Attorneys, Earthjustice Legal Defense Fund, Bozeman, Montana, with him on the brief), for Defendants-Intervenors-Appellants.

Paul Martin Seby, Moye White, LLP (Marian C. Larsen, Attorney, Colorado Mining Association, with him on the brief), Denver, Colorado, for Intervenor-Appellee.

Sally J. Magnani, Supervising Deputy Attorney General, State of California, Sacramento, California; Mary Sue Wilson, Senior Assistant Attorney General, State of Washington, Olympia, Washington; Jeremiah D. Weiner, Assistant Attorney General, State of Montana, Helena, Montana; Roger J. DeHoog, Senior Assistant Attorney General, State of Oregon, Salem, Oregon, filed an amicus curiae brief for the State of California, State of Washington, State of Montana, and State of Oregon.

James Martin Manley, Lakewood, Colorado, filed an amicus curiae brief for the Mountain States Legal Foundation.

Paul A. Turcke, Moore Smith Buxton & Turcke, Boise, Idaho, filed an amicus curiae brief for the Blue Ribbon Coalition, California Association of 4 Wheel Drive Clubs, United Four Wheel Drive Associations, and American Counsel of Snowmobiles Associations.

Matthew A. Morr, Featherstone Petrie DeSisto LLP, Denver, Colorado, filed an amicus curiae brief for the Alaska Miners Association, Utah Mining Association, New Mexico Mining Association, Northwest Mining Association, Wyoming Mining Association, and The Western Business Roundtable.

---

Before **MURPHY**, **ANDERSON**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

3

Defendants Forest Service[1] and Defendants-Intervenors-Appellants Environmental Groups[2] appeal the district court's order setting aside and permanently enjoining the Roadless Area Conservation Rule ("Roadless Rule"), which the Forest Service promulgated in 2001. In setting aside the Roadless Rule, the district court held that the rule violated the Wilderness Act of 1964 ("Wilderness Act"), 16 U.S.C. §§ 1131–36, and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–70. *See Wyoming v. U.S. Dep't of Agric.*, 570 F. Supp. 2d 1309 (D. Wyo. 2008).[3]

On appeal, the Forest Service and the Environmental Groups ask us to hold

---

[1] Defendants "Forest Service" collectively refers to the United States Department of Agriculture; the United States Forest Service; Tom Vilsack, Secretary of the United States Department of Agriculture, in his official capacity; and Tom Tidwell, Chief Forester of the United States Forest Service, in his official capacity.

When this action was commenced, Mike Johanns was the Secretary of Agriculture and Dale N. Bosworth was the Chief Forester for the Forest Service. Mr. Johanns and Mr. Bosworth have since been replaced by Tom Vilsack and Tom Tidwell. Thus, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mr. Vilsack and Mr. Tidwell were automatically substituted as the proper party Defendants.

[2] Defendants-Intervenors-Appellants "Environmental Groups" collectively refers to the Biodiversity Conservation Alliance; Defenders of Wildlife; National Audubon Society; Natural Resources Defense Council; Pacific Rivers Council; Sierra Club; Wilderness Society; and Wyoming Outdoor Council.

[3] As discussed below, this is the second time Wyoming has brought a challenge to the Roadless Rule, the second time the Wyoming district court has set it aside for violating NEPA and the Wilderness Act, and the second time Wyoming's challenge has come before this court on appeal. *See infra* Part I.C (discussing the procedural history of this case).

4

that the Roadless Rule was not promulgated in violation of the Wilderness Act or NEPA. Furthermore, even if we were to conclude that the rule was promulgated in violation of federal law, they ask us to nevertheless reverse the district court's order establishing a permanent nationwide injunction. Plaintiff-Appellee State of Wyoming and Intervenor-Appellee Colorado Mining Association ("CMA")[4] ask us to affirm the district court order on the grounds that the rule does in fact violate the Wilderness Act and NEPA. In the event that we conclude that the Roadless Rule complies with the Wilderness Act and NEPA, they ask us to affirm on the alternate grounds that the rule was promulgated in violation of the Multiple-Use Sustained-Yield Act ("MUSYA"), 16 U.S.C. §§ 528–31, and also the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–14. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **REVERSE** the district court's order granting Plaintiff's declaratory relief and issuing a permanent injunction, and **REMAND** the case for the district court to vacate the permanent injunction.

## I.    BACKGROUND

Due to the complexity of this case, we initially offer an overview of the applicable statutory framework, the factual background of the Roadless Rule, and

---

[4]     CMA is an association, comprised of 650 members, that "engage[s] in the production of coal, metals, and agricultural and industrial minerals throughout Colorado and the West." *Wyoming*, 570 F. Supp. 2d at 1319.

the procedural history.

A.     **Statutory Framework**

The Forest Service currently manages over 191 million acres of National

Forest System ("NFS") land, including 155 national forests, 20 national

grasslands, 8 land utilization projects, 20 research and experimental areas, and 33

"other areas."  36 C.F.R. § 200.1.  The Forest Service is responsible for managing

the NFS under, *inter alia*, the Organic Administration Act of 1897 ("Organic

Act"), 16 U.S.C. §§ 473–482, 551, MUSYA, and NFMA.  On a general level,

these statutes authorize the Forest Service to manage NFS lands for multiple uses.

In managing the NFS, however, the Forest Service also must comply with the

Wilderness Act and NEPA.  These relevant statutes are briefly discussed in turn.

In 1897, Congress passed the Organic Act.  16 U.S.C. §§ 473–482, 551.

The Act "established a limited multiple-use mandate for management of the

National Forests," *Wyoming*, 570 F. Supp. 2d at 1320, including such purposes as

"improv[ing] and protect[ing] the forest[s]," "securing favorable conditions of

water flows," and "furnish[ing] a continuous supply of timber for the use and

necessities of citizens of the United States."  16 U.S.C. § 475.  The Act authorizes

the Secretary of Agriculture to "make provisions for the protection against

destruction by fire and depredations upon the public forests and national forests,"

in order "to regulate their occupancy and use and to preserve the forests thereon

6

from destruction." *Id.* § 551.[5]

More than sixty years later, in 1960, Congress enacted MUSYA. 16 U.S.C. §§ 528–31. MUSYA codified the multiple-use mandate first articulated in the Organic Act, directing the Forest Service to "administer the renewable surface resources of the national forests for multiple use and sustained yield," including for the purposes of "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." *Id.* §§ 528, 529.

In 1964, Congress enacted the Wilderness Act, 16 U.S.C. §§ 1131–36, which "established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as 'wilderness areas,'" *id.* § 1131. More specifically, the Act put in place a process under which Congress designates "wilderness areas," *id.* § 1132, and established requirements for the management and protection of such areas, *see id.* § 1133 (listing the uses permitted in congressionally designated wilderness areas). In order to aid Congress in designating "wilderness," the Act required the Forest Service to review "primitive" areas of the NFS to determine their "suitability or nonsuitability for preservation as wilderness." *Id.* § 1132(b).

In 1972, the Forest Service completed the Roadless Area Review and

---

[5]     The Forest Service began actively managing the NFS—under the authority of the Organic Act—in 1905, after the department was transferred to the Department of Agriculture. *Wyoming*, 570 F. Supp. 2d at 1320 & n.3.

Evaluation project (RARE I), which resulted in a nationwide inventory of NFS areas—totaling approximately 56 million acres—that the agency deemed to be suitable for "wilderness" designation pursuant to the Wilderness Act. However, the RARE I inventory was abandoned following a successful judicial challenge under NEPA. *See Wyo. Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973).

In 1976, Congress passed NFMA. 16 U.S.C. §§ 1600–14. The Act, "which is primarily concerned with planning," *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1131 (10th Cir. 2007), "requires the Forest Service to 'develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System.'" *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting 16 U.S.C. § 1604(a)). NFMA establishes both substantive and procedural requirements for the development and implementation of forest management plans under the Act, s*ee* 16 U.S.C. § 1604, including the requirement that each forest plan comply with MUSYA's multiple-use mandate, *id.* § 1604(e)(1).

From 1977 until 1979, the Forest Service embarked on a second Roadless Area Review and Evaluation project (RARE II), which again created a national inventory of roadless areas that were potentially suitable for "wilderness" designation under the Wilderness Act. *See, e.g.*, *California v. Block*, 690 F.2d 753, 758 (9th Cir. 1982) (describing the development of the RARE II inventory).

8

Based on the RARE II inventory (and subsequent presidential recommendations), *see* 16 U.S.C. § 1132, Congress designated several NFS areas as "wilderness," which—combined with the designations included in the Wilderness Act itself, *see* 16 U.S.C. § 1132(a)—total approximately 35 million acres. *See* 66 Fed. Reg. 35,918, 35,919 (July 10, 2001).

**B.     History of the Roadless Rule**

The RARE II undertaking, completed in 1979, produced a nationwide inventory of roadless areas that the Forest Service found worthy of some level of protection. Over the next two decades, however, the Forest Service began permitting road construction to occur in some of those inventoried roadless areas ("IRAs") on a site-specific basis. 66 Fed. Reg. 3244, 3246 (Jan. 12, 2001); *see also Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1105 (9th Cir. 2002) (stating that, in 1982, the Forest Service started "permitt[ing] road construction, industrial logging[,] and other development in inventoried roadless areas on a local, site-specific basis" (citing *Block*, 690 F.2d 753)), *abrogated in part on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1180 (9th Cir. 2011) (abandoning the "federal defendant" rule and holding that "[w]hen considering motions to intervene of right . . . , courts need no longer apply a categorical prohibition on intervention on the merits, or liability phase, of NEPA actions"). During that time, roads were constructed, and other development occurred, on 2.8 million acres of those IRAs. 66 Fed. Reg. at 3246; *Kootenai*

*Tribe*, 313 F.3d at 1105.

In the late 1990s, the Forest Service began to reevaluate its road-management policy in response to changes in public opinion, shifts in resource demands, budget constraints regarding the management of the NFS road system, and an increase in scientific knowledge regarding the effects that roads have on NFS lands. *See* 63 Fed. Reg. 4350, 4350 (Jan. 28, 1998). The agency published an advance notice of proposed rulemaking in January of 1998, which solicited public comment on future regulation and protection of IRAs. *Id.* The Forest Service thereafter adopted an eighteen-month moratorium on road construction in most IRAs—the "Interim Roadless Rule"—which ran from March 1999 through August 2000. 64 Fed. Reg. 7290, 7290 (Feb. 12, 1999). The Interim Roadless Rule "temporarily suspend[ed] decisionmaking regarding road construction and reconstruction in many unroaded areas within the National Forest System," in order to "retain resource management options in those unroaded areas subject to suspension from the potentially adverse effects associated with road construction, while the Forest Service develop[ed] a revised road management policy." *Id.*

While the Interim Roadless Rule was in effect, in October of 1999, President William J. Clinton "direct[ed] the Forest Service to develop . . . regulations to provide appropriate long-term protection for most or all of these currently inventoried 'roadless' areas" in the NFS. Aplt. App. at 1524 (Memorandum from President William Clinton to the Secretary of Agriculture

10

(Oct. 13, 1999)).  On October 13, 1999, in response to President Clinton's directive, as well as public comments received on the 1998 advanced notice of proposed rulemaking and the Interim Roadless Rule, the Forest Service published a notice of intent ("NOI") to prepare an environmental impact statement ("EIS") in accordance with NEPA, and to "initiat[e] a public rulemaking process to propose the protection of remaining roadless areas within the National Forest System."  64 Fed. Reg. 56,306, 56,306 (Oct. 19, 1999).  The NOI announced the agency's intent to promulgate a two-part rule for protection of roadless areas: (1) "[P]art one would immediately restrict certain activities, such as road construction, in unroaded portions of inventoried roadless areas, as previously identified in RARE II and existing forest plan inventories"; and (2) "[p]art two would establish national direction for managing [IRAs], and for determining whether and to what extent similar protections should be extended to uninventoried roadless areas," a process that "would be implemented at the forest plan level through the plan amendment and NEPA process."  *Id.* at 56,307.

The NOI also initiated a sixty-day "scoping period," during which the agency sought public comment on the nature and scope of the issues and alternatives to be analyzed during the NEPA process.  *Id.*  During the sixty-day scoping period, the Forest Service received more than 517,000 comments in response to the NOI, held 187 meetings around the nation (including several in Wyoming) attended by approximately 16,000 citizens, and launched a Roadless

11

Area Conservation website (roadless.fs.fed.us) to provide information about the rulemaking. 66 Fed. Reg. at 3248; 64 Fed. Reg. 67,822, 67,825–29 (Dec. 3, 1999). Despite several requests, the Forest Service declined to extend the scoping period beyond the initial sixty days.

On May 10, 2000, the Forest Service issued a draft EIS ("DEIS") and proposed Roadless Rule. *See generally* 65 Fed. Reg. 30,276 (May 10, 2000); Aplt. App. at 425 (Draft Environmental Impact Statement, dated May 2000) [hereinafter DEIS]. The DEIS identified 54.3 million acres of IRAs that were subject to the proposed rule. 65 Fed. Reg. at 30,276. The stated purposes of the proposed rule were "to immediately stop activities that have the greatest likelihood of degrading desirable characteristics of inventoried roadless areas," and "to ensure that ecological and social characteristics of inventoried roadless and other unroaded areas are identified and considered through local forest planning efforts." DEIS at S-4; *see also id.* at 1-12 (stating that the first objective of the rule was to "[p]revent activities that can most directly threaten [IRAs] by implementing national prohibitions against road construction and reconstruction").

The proposed rule was two-fold, composed of (1) a "Prohibition Rule," which banned road construction and reconstructions in IRAs, and (2) a "Procedural Rule," which required forest managers to identify additional roadless areas during the forest planning process and determine whether such areas

12

warranted protection under individual forest plans. *See* 65 Fed. Reg. at 30,288 (to be codified at 36 C.F.R. §§ 294.12, 294.13). The Forest Service considered four alternatives to the Prohibition Rule in detail in the DEIS—a "no-action" alternative and three alternatives prohibiting road building and timber harvest to varying degrees. *See id.* at 2-3 to 2-6. Specifically, the four prohibition alternatives analyzed were: (1) Alternative 1—the "no action" alternative, *id.* at 2-4; (2) Alternative 2—a prohibition on "road construction and reconstruction within unroaded portions of [IRAs]," *id.* at 2-4 to 2-5; (3) Alternative 3—a prohibition on "road construction, reconstruction, and timber harvest except for stewardship purposes within unroaded portions of [IRAs]," *id.* at 2-5; and (4) Alternative 4—a prohibition on "road construction, reconstruction[,] and all timber harvest within unroaded portions of [IRAs]," *id.* at 2-6. In the DEIS, the Forest Service designated Alternative 2 as the preferred alternative for the prohibition rule. *Id.* at 2-13.[6]

Other alternatives to the Prohibition Rule were addressed by the Forest Service, such as allowing more (rather than less) road building and development, but those alternatives were eliminated from detailed environmental analysis because they were inconsistent with the purpose of protecting IRAs or for other reasons. *Id.* at 2-15 to 2-20. The Forest Service provided sixty-nine days for

---

[6] The Forest Service also considered several "procedural alternatives." DEIS at 2-6 to 2-10.

13

public comment on the DEIS and proposed rule, 65 Fed. Reg. at 30,276, during which it received more than a million responses and held more that 430 public meetings drawing at least 23,000 people nationwide.  66 Fed. Reg. at 3248.

In November 2000, the Forest Service issued a final EIS ("FEIS").  65 Fed. Reg. 69,512 (Nov. 17, 2000); Aplt. App. at 520 (Final Environmental Impact Statement, dated Nov. 9, 2009) [hereinafter FEIS].  The FEIS included several changes to the proposed action that were not included in the DEIS.  First, it increased the total acreage of IRAs subject to the Prohibition Rule from 54.3 million acres to 58.5 million acres.  FEIS at 2-23.  The revised figure included 4.2 million acres of IRAs not identified in the DEIS or proposed rule.  *Id.*  Second, it made the rule applicable to both the "unroaded" and "roaded" portions of IRAs; that is, the Roadless Rule would "now apply to the entire area within the boundaries of an [IRA]," whereas the 2.8 million acres of "roaded" IRAs were not subject to the prohibitions in the proposed rule as it was described in the DEIS. *Id.*[7]  Third, the FEIS changed the preferred alternative—previously identified as Alternative 2, which prohibited road construction and reconstruction in IRAs—to Alternative 3, which, as described in the FEIS, prohibited "[r]oad construction, reconstruction (including temporary construction) *and* timber harvest except for

_____

[7]      This change was made because the Forest Service "believe[d] it would be difficult to identify the 'roaded portions' [of IRAs] in a manner that would be ecologically meaningful and administratively consistent."  FEIS at 2-23.  The FEIS did not include any additional maps identifying the 2.8 million acres of "roaded" IRAs that were now subject to the prohibitions under the rule.

stewardship purposes" in IRAs, subject to a few limited exceptions. FEIS at 2-13 to 2-14 (emphasis added). Fourth, the FEIS eliminated the procedural aspect of the rule, leaving only the Prohibition Rule, due to the Forest Service's decision to incorporate such procedures into a separate and distinct set of forest planning regulations. *See* FEIS at 1-16 (stating that "the Forest Service determined that the procedures contemplated in the [proposed] Roadless Rule should be an explicit part of the plan revision process, and addressed them at 36 CFR 219.9(b)(8) of the final Planning Regulations").

Following the issuance of the FEIS, the Forest Service received additional public comments on the FEIS and the modified preferred alternative. 66 Fed. Reg. at 3248. The comments submitted in response to the FEIS "were considered by the agency in the development of the final rule" and were admitted into the administrative record. *Id.*

On January 12, 2001, the Forest Service issued the final Roadless Rule and the Record of Decision on the rule. 66 Fed. Reg. at 3244–72. The final Roadless Rule—which mirrors the preferred alternative from the FEIS (Alternative 3)—prohibits road construction and reconstruction in IRAs, and prohibits the cutting, sale, or removal of timber from IRAs, subject to limited exceptions. *Id.* at 3272–73 (to be codified at 36 C.F.R. §§ 294.10–.14).[8]

---

[8]   The final Roadless Rule restricted timber harvests under the stewardship exception to "small diameter timber," whereas the FEIS did not

(continued...)

The final Roadless Rule was applicable to the 58.5 million acres of IRAs identified in the FEIS, which amounts to approximately one-third of all NFS lands and approximately 2% of the land base of the continental United States.  66 Fed. Reg. at 3245.  As specific to Wyoming, "[t]he Roadless Rule affects 3.25 million acres (or 35%) of the 9.2 million acres of National Forest System land in [the state]."  *Wyoming*, 570 F. Supp. 2d at 1326; *see also* FEIS at 3-4 tbl.3-1, 3-61 tbl.3-9, A-4.  The Roadless Rule was to take effect on March 12, 2001.  66 Fed. Reg. at 3244.  Under the Roadless Rule, as promulgated, "this vast national forest acreage, for better or worse, was more committed to pristine wilderness, and less amenable to road development for purposes permitted by the Forest Service." *Kootenai Tribe*, 313 F.3d at 1106.

## C.    Procedural History

This is not the first instance in which this court has considered a challenge to the Roadless Rule brought by Wyoming.[9]  On May 18, 2001, shortly after the

_____

[8](...continued)
explicitly limit the size or diameter that could be harvested for stewardship purposes.  *Compare* 66 Fed Reg. at 3273 (to be codified at 36 C.F.R. § 294.13(b)(1)), *with* FEIS at 2-15.

[9]    Since 2001, the Roadless Rule has been the subject of at least nine lawsuits, including suits filed in federal district court in Idaho, Utah, North Dakota, Wyoming, Alaska, and the District of Columbia.

Of particular importance, on May 10, 2001, the United States District Court for the District of Idaho found that the plaintiffs had demonstrated likely success on the merits of their claims that the Forest Service violated NEPA in

(continued...)

16

Roadless Rule was promulgated, Wyoming filed its first complaint in the United States District Court for the District of Wyoming challenging the legality of the Roadless Rule under several federal environmental statutes, including NEPA, the Wilderness Act, the Wyoming Wilderness Act of 1984, NFMA, and MUSYA. A number of environmental organizations intervened on behalf of the Forest Service, in defense of the rule.[10] On July 14, 2003, the Wyoming district court ruled that the Roadless Rule was promulgated in violation of NEPA and the Wilderness Act, and therefore permanently enjoined enforcement of the rule.

---

[9](...continued)
promulgating the Roadless Rule by failing to (a) consider a reasonable range of alternatives, (b) satisfy the notice-and-comment requirements of the Act, and (c) adequately analyze the cumulative impacts of the rule. *Kootenai Tribe of Idaho v. Veneman*, 142 F. Supp. 2d 1231, 1242–47 (D. Idaho 2001). Based on this ruling, the district court subsequently issued a preliminary injunction prohibiting the implementation of the Roadless Rule. *Kootenai Tribe of Idaho v. Veneman*, No. CV01-10-N-EJL, 2001 WL 1141275 (D. Idaho May 10, 2001). On appeal, the Ninth Circuit reversed the district court's judgment and remanded the case. *Kootenai Tribe*, 313 F.3d at 1094. In doing so, the Ninth Circuit held that the district court erred in holding that (a) "[t]he Forest Service's consideration of the three alternatives was [in]adequate," *id.* at 1123; (b) "holding that the plaintiffs had shown likely success on the merits based on their allegation" that the comment period of sixty-nine days "deprived the public of information necessary for its meaningful participation in the NEPA process," *id.* at 1119; and (c) "the Forest Service failed adequately to evaluate the cumulative effects of the Roadless Rule," *id.* at 1123. In sum, the Ninth Circuit concluded that "it is plain that the Forest Service gave a 'hard look' [under NEPA] at the complex problem presented," and that "[e]ven if plaintiffs have shown a serious question of liability, it cannot be said that there is a strong likelihood of success on the merits [of their NEPA claims]." *Id.*

[10] The Defendant-Intervenors in the first suit are the same Environmental Groups that intervened in this cause of action.

17

*Wyoming v. U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1239 (D. Wyo. 2003). The Forest Service chose not to appeal the district court's decision to this court; however, the Defendant-Intervenors did file an appeal with the Tenth Circuit.

During the pendency of that appeal—in May of 2005—the Forest Service adopted the State Petitions Rule, which superseded the Roadless Rule. *See* State Petitions for Inventoried Roadless Area Management, 70 Fed. Reg. 25,654 (May 13, 2005) (to be codified at 36 C.F.R. pt. 294). Because the Roadless Rule had been superseded, this court dismissed the appeal as moot, vacated the district court's July 14, 2003, decision, and remanded the case to the district court to dismiss without prejudice. *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1213 (10th Cir. 2005).

Subsequently, several states and environmental groups challenged the Forest Service's State Petitions Rule in the United States District Court for the Northern District of California. On October 11, 2006, a district court judge of that court set aside the State Petitions Rule for violating NEPA and the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–44, and reinstated the Roadless Rule, despite the fact that the Wyoming district court had already found that the rule violated federal law. *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874 (N.D. Cal. 2006).[11]

---

[11] On appeal, the Ninth Circuit affirmed the district court's reinstatement of the Roadless Rule. *California ex rel. Lockyer v. U.S. Dep't of*

(continued...)

18

After the Roadless Rule was reinstated by the California district court, Wyoming brought a renewed challenge to the rule in the District of Wyoming, asserting violations of the Wilderness Act, NEPA, MUSYA, and NFMA. On August 12, 2008, the Wyoming district court ruled—for the second time—that the Roadless Rule was promulgated in violation of the Wilderness Act and NEPA, and issued a permanent, nationwide injunction. *Wyoming v. U.S. Dep't of Agric.*, 570 F. Supp. 2d 1309, 1355 (D. Wyo. 2008). The Environmental Groups filed a timely appeal with this court.

## II.    DISCUSSION

### A.    Standard of Review

Because NEPA, NFMA, MUSYA, and the Wilderness Act do not provide a private right of action, we review the Forest Service's promulgation of the Roadless Rule as "final agency action" under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–59. *E.g.*, *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 428 (10th Cir. 2011) (per curiam); *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 823 (10th Cir. 2008); *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). Under the APA, we review the district court's decision de novo, *Forest Guardians*, 641 F.3d at 428, but we will not overturn the agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

[11](...continued)
*Agric.*, 575 F.3d 999 (9th Cir. 2009).

19

accordance with law."  5 U.S.C. § 706(2)(A); *accord New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009).

In conducting our review, "we must determine whether the [agency]: (1) acted within the scope of [its] authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion."  *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 704 (10th Cir. 2010) (alterations in original) (internal quotation marks omitted). Agency action is "arbitrary and capricious" if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793–94 (10th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).  In applying this standard, we also "accord agency action a presumption of validity," and "the burden is on the petitioner to demonstrate that the action is arbitrary and capricious."  *Tidwell*, 603 F.3d at 793.

We review the district court's order of injunctive relief for abuse of discretion.  *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009).  "An abuse of discretion occurs only when the trial court bases its decision on an

20

erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1223–24 (10th Cir. 2008). We have previously characterized an "abuse of discretion" as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009).

### B. Wilderness Act Claim

Wyoming's Wilderness Act claim asserts that the Roadless Rule constitutes a de facto designation of "wilderness" in contravention of the process established by Congress in the Wilderness Act of 1964. The district court agreed, holding that the "Forest Service, through the promulgation of the Roadless Rule, designated 58.5 million acres of National Forest land as a de facto wilderness area in violation of the Wilderness Act," and therefore the rule was "promulgated in excess of [the] Forest Service's statutory jurisdiction and authority." *Wyoming*, 570 F. Supp. 2d at 1349–50. We conclude that the district court erred in finding that the Forest Service promulgated the rule in violation of the Wilderness Act.

### 1. Overview of Wilderness Act

Congress passed the Wilderness Act in 1964, 16 U.S.C. §§ 1131–36, for the purpose of "secur[ing] for the American people of present and future generations the benefits of an enduring resource of wilderness." *Id.* § 1131(a). The Wilderness Act established the National Wilderness Preservation System, which

was "to be composed of federally owned areas designated by Congress as 'wilderness areas.'" *Id.* Congress immediately designated certain areas as "wilderness areas" in the Act. *See id.* § 1132(a) ("All areas within the national forests classified . . . by the Secretary of Agriculture or the Chief of the Forest Service as 'wilderness', 'wild', or 'canoe' are hereby designated as wilderness areas."). The Wilderness Act also established a process by which NFS lands could be designated as "wilderness areas" in the future. *Id.* § 1132(b). Under this process for designating "wilderness" in the future, the Secretary of Agriculture determines which NFS lands are suitable for preservation as wilderness and reports those findings to the President, who then submits recommendations to Congress as to which NFS lands should be regulated as wilderness areas under the Act. *Id.* Such lands actually become "wilderness areas" protected by the provisions of the Wilderness Act only if Congress enacts legislation to that effect. *Id.* Indeed, Congress explicitly stated that "no Federal lands shall be designated as 'wilderness areas' except as provided for in [the Wilderness Act] or by a subsequent Act." *Id.* § 1131(a).

The Act defines "wilderness" as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain," as well as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation." *Id.* § 1131(c). Congress further defined "wilderness" as an area that

22

(1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.*

Areas designated as "wilderness areas" by Congress under the Act must be maintained so as to "preserv[e] the wilderness character of the area" and "shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use," unless an exception applies. *Id.* § 1133(b). In order to preserve the character of areas designated by Congress as "wilderness," the Act prohibits a wide array of uses within such areas:

> [T]here shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

*Id.* § 1133(c).

The Act includes seven "special provisions," which serve as exceptions to the general use prohibitions found in § 1133(c). *See id.* § 1133(d)(1)–(7). These "special provisions" allow, among other things, for (1) "measures . . . [for]

23

control of fire, insects, and diseases, subject to such conditions as the Secretary deems desirable"; (2) "prospecting" and activities carried out "for the purpose of gathering information about mineral or other resources, if such activity is carried on in a manner compatible with the preservation of the wilderness environment"; (3) certain development of water resources, if approved by the President; (4) "grazing of livestock," but only if established before September 1964; and (5) "[c]ommercial services . . . to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas."

*Id.* § 1133(d)(1), (2), (4), & (5).[12]

Lastly, the Wilderness Act establishes that its provisions are "declared to be within and supplemental to the purposes for which national forests . . . are established and administered," *id.* § 1133(a), and therefore Congress made clear that "[n]othing in [the Wilderness Act] shall be deemed to be in interference with the purpose for which national forests are established as set forth in the [Organic Act] (30 Stat. 11), and [MUSYA] (74 Stat. 215)." *Id.* § 1133(a)(1).

## 2.    Discussion

As stated by the district court, the narrow issue presented by this claim is "whether the Forest Service has usurped Congress'[s] power regarding access to,

---

[12]     The Act also included an exception for "mining" that was conducted pursuant to U.S. mining laws and valid existing rights. 16 U.S.C. § 1133(d)(3). However, that "special provision" has expired and mining is no longer permitted in "wilderness areas" designated by Congress under the Wilderness Act.

and management of, public lands by a de facto designation of 'wilderness' in violation of the Wilderness Act of 1964." *Wyoming*, 570 F. Supp. 2d at 1346. The district court held that the Roadless Rule established de facto wilderness areas and was therefore promulgated in violation of the Wilderness Act, which gives Congress the sole authority to establish "wilderness areas." *Id.* at 1349–50.

On appeal, the Forest Service first argues that the Wilderness Act did not repeal or in any way limit its broad authority to regulate NFS lands for conservation purposes, including "wilderness," and therefore it was authorized to promulgate the Roadless Rule. In the alternative, even assuming, *arguendo*, that the Wilderness Act did repeal or limit the Forest Service's authority to regulate "wilderness areas" by administrative rule, the Forest Service and the Environmental Groups argue that the IRAs governed by the Roadless Rule are not de facto wilderness areas. Therefore, they assert that the Roadless Rule was a valid exercise of the authority granted under the Organic Act and MUSYA "to manage NFS lands for an array of uses or combinations of use, including conservation uses that *fall short of* statutory 'wilderness' designations." Forest Serv. Opening Br. at 32 (emphasis added). We agree with the latter argument—*viz.*, that the Forest Service did not usurp congressional authority because the Roadless Rule did not establish de facto wilderness areas—and, therefore, conclude that the district court erred in holding otherwise. Accordingly, we need not address the first argument advanced by the Forest

25

Service regarding whether it retains the authority under the Organic Act and MUSYA to regulate de facto wilderness areas by administrative rule.

### a. Roadless Rule Did Not Establish De Facto Wilderness Areas

The district court's conclusion that the Roadless Rule created de facto wilderness in violation of the Wilderness Act was based largely on its finding that "wilderness areas" governed by the Wilderness Act and IRAs governed by the Roadless Rule "are essentially the same," and that "[i]n fact, uses in [IRAs] are even more restricted than those permitted in congressionally designated wilderness areas." *Wyoming*, 570 F. Supp. 2d at 1349. However, a comparison of the provisions of the Wilderness Act and the Roadless Rule demonstrates that IRAs and wilderness areas are not functionally equivalent or "essentially the same." To the contrary, the two types of areas are distinct. In fact, such a comparison demonstrates that the scope of the Wilderness Act is broader than the scope of the Roadless Rule; that is, the Wilderness Act is more restrictive and prohibitive than the Roadless Rule.[13]

---

[13] The district court also based its conclusion that the Roadless Rule "designated 58.5 million acres of National Forest land as a de facto wilderness area in violation of the Wilderness Act," *Wyoming*, 570 F. Supp. 2d at 1349, on its findings that (a) "a roadless forest is synonymous with the Wilderness Act's definition of 'wilderness,'" and (b) "that most, if not all, of the [IRAs] were based on the RARE II inventories, which were designed to recommend wilderness areas to Congress." *Id.* at 1349–50. However, we are not persuaded that these two factors alone—which relate to identifying areas that would be governed by the Roadless Rule, rather than to whether the two types of areas are functionally

(continued...)

26

As a general matter, the Roadless Rule restricts only two activities—road construction and commercial timber harvesting, unless an exception applies. *See* 66 Fed. Reg. at 3272–73 (to be codified at 36 C.F.R. §§ 294.12–.13). On the other hand, although the Wilderness Act likewise prohibits permanent and temporary roads and commercial logging, it additionally prohibits all "commercial enterprise," "motor vehicles, motorized equipment or motorboats," all "form[s] of mechanical transport," and any "structure or installation," unless an exception applies. 16 U.S.C. § 1133(c). This rudimentary comparison of the general use prohibitions in IRAs and wilderness areas demonstrates that they are not the same; the uses prohibited in wilderness areas under the Wilderness Act are greater in number and scope than those prohibited in IRAs under the Roadless Rule.

We acknowledge that the Wilderness Act and Roadless Rule do in fact overlap in coverage in many ways. However, the issue we are to consider is whether the IRAs governed by the Roadless Rule are de facto wilderness areas; that is, whether the Roadless Rule essentially mirrors the Wilderness Act by a different label. A closer examination of the precise differences between IRAs and

[13](...continued)
equivalent under each respective law—demonstrate that IRAs under the Roadless Rule are de facto administrative wilderness areas. As discussed *infra*, a review of the prohibitions applicable to each type of area clearly demonstrates that IRAs governed by the Roadless Rule are not tantamount to wilderness areas governed by the Wilderness Act. This conclusion is dispositive on this issue.

wilderness areas further demonstrates that the Roadless Rule does not establish de facto wilderness. First, although the Wilderness Act prohibits permanent structures and installations, the Roadless Rule does not prohibit the construction of permanent or temporary structures or installations. *Compare* 16 U.S.C. § 1133(c), *with* 66 Fed. Reg. at 3272–73 (to be codified at 36 C.F.R. §§ 294.10–.14). Therefore, structures and installations that can be erected without the construction of a new road—for example, through the use of an existing road—are permitted in IRAs, but not in wilderness areas.

Second, the Wilderness Act imposes significantly more stringent prohibitions on recreational activities. Under the Wilderness Act, any "use of motor vehicles, motorized equipment or motorboats, . . . landing of aircraft, . . . [or] other form of mechanical transport" is prohibited. 16 U.S.C. § 1133(c). On the other hand, the Roadless Rule contains no prohibitions on the use of motorized vehicles or equipment, boats or aircraft, or other forms of mechanical transport. Therefore, many recreational uses allowed to continue under the Roadless Rule—such as off-road vehicle use, biking, snowmobiling, and other motorized and mechanical activities—would be prohibited under the Wilderness Act. *See, e.g.*, 66 Fed. Reg. at 3245 (stating that "unlike Wilderness," the Roadless Rule permits the "use of mountain bikes, and other mechanized means of travel"); *id.* at 3249 ("The Roadless [Rule], unlike the establishment of wilderness areas, will allow a multitude of activities including motorized uses

28

. . . ."); *id.* at 3267 ("[IRAs] provide a remote recreation experience without the activity restrictions of Wilderness (for example, off-highway vehicle use and mountain biking).").[14]

Third, the Wilderness Act is more restrictive in terms of road maintenance, road construction, and use of existing roads. The Wilderness Act prohibits any "permanent road" or any "temporary road," and road maintenance activities, subject to limited exceptions,[15] and prohibits any use of motor vehicles. 16 U.S.C. § 1133(c); 36 C.F.R. § 293.6. On the other hand, the Roadless Rule allows all existing classified roads—defined as roads "wholly or partially within or adjacent to [NFS] lands that [are] determined to be needed for long-term motor

---

[14]     The Wilderness Act does provide that the "use of aircraft or motorboats, where these uses have already become established, may be permitted to continue subject to such restrictions as the Secretary of Agriculture deems desirable." 16 U.S.C. § 1133(d)(1). However, the Wilderness Act still prohibits all other types of motorized or mechanical recreation or transportation, subject to a very limited exception, *see* 36 C.F.R. § 293.6, as well as the use of aircraft or motorboats that had not already become established. The Roadless Rule, on the other hand, does not prohibit the use of aircraft or motorboats, which could be brought in and out of IRAs through existing roads, and does not prohibit the use of off-road vehicles, bicycles, and other forms of motorized or mechanized transportation.

[15]     Under the Wilderness Act, *temporary* roads are permitted "as necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act] (including measures required in emergencies involving the health and safety of persons within the area)," 16 U.S.C. § 1133(c), and for "prospecting for water resources, the establishment and maintenance of reservoirs, water-conservation works, power projects, transmission lines, and other facilities needed in the public interest," and for "road construction and maintenance essential to development and use thereof," but only when authorized by the President, *id.* § 1133(d)(4).

29

vehicle access, including State roads, county roads, privately owned roads, National Forest System roads, and other roads authorized by the Forest Service, 66 Fed. Reg. at 3272 (to be codified at 36 C.F.R. § 294.11)—to be maintained. *Id.* at 3273 (to be codified at 36 C.F.R. § 294.12(c)).[16]  Therefore, unlike the Wilderness Act, the Roadless Rule permits unlimited maintenance of all existing roads and does not prohibit the use of motorized vehicles or other motorized transportation on such existing roads.

Furthermore, the Roadless Rule provides broader exceptions for when new road construction or reconstruction can occur.  For example, unlike in wilderness areas, "a road may be constructed or reconstructed in an [IRA] . . . as provided for by statute or treaty," *id.* at 3272 (to be codified at 36 C.F.R. § 294.12(b)(3));[17] when "needed to conduct a response action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) or to conduct a natural resource restoration action under CERCLA, [§] 311 of the Clean Water Act, or the Oil Pollution Act," *id.* (to be codified at 36 C.F.R. § 294.12(b)(2)); or when the "Secretary of Agriculture determines that a Federal Aid Highway project . . . is in the public interest or is consistent with the

---

[16]     "Road maintenance" is defined as "[t]he ongoing upkeep of a road necessary to retain or restore the road to the approved road management objective."  66 Fed. Reg. at 3272 (to be codified at 36 C.F.R. § 294.11).

[17]     *See, e.g.*, 66 Fed. Reg. at 3264 ("Reasonable access includes[] road construction or reconstruction for mining activities covered under the General Mining Law . . . .").

purposes for which the land was reserved or acquired," *id.* (to be codified at 36 C.F.R. § 294.12(b)(6)), among other instances. The Wilderness Act includes no exceptions of this kind to its prohibition of temporary and permanent roads.

Fourth, the Roadless Rule is less restrictive in terms of "grazing." Under the Wilderness Act's mandate that "there shall be no commercial enterprise . . . within any wilderness area," 16 U.S.C. § 1133(c), commercial livestock grazing is prohibited. The Act includes a grandfather clause that permits "the grazing of livestock . . . [that was] established prior to September 3, 1964," *id.* § 1133(d)(4)(2), more than four decades ago, but otherwise completely bars such activity. By contrast, the Roadless Rule does not explicitly prohibit *any* type of "commercial enterprise," with the exception of commercial logging, and therefore permits commercial grazing within IRAs. The district court found this distinction meaningless because "one could not meaningfully set cattle out to pasture in a roadless area with no way of rounding those cattle back up or trucking them in and out of the forest allotment," unless a new road was constructed. *Wyoming*, 570 F. Supp. 2d at 1350. However, this conclusion does not take into account that all existing roads—as well as any roads constructed or reconstructed under exceptions to the Roadless Rule—could be used to facilitate commercial grazing. This would not be permitted in a wilderness areas due to the general prohibition on commercial enterprises (unless such grazing was established more than four decades ago), as well as the Act's prohibition on the use of motorized vehicles or

31

equipment. Accordingly, the court's dismissal of this distinction was unfounded.

Fifth, the Roadless Rule allows for mineral development to a greater extent than does the Wilderness Act. Although the Wilderness Act initially permitted mineral development under United States mining laws, wilderness areas governed by the Act are now closed to mineral-development activities. 16 U.S.C. § 133(d)(3).[18] On the other hand, the Roadless Rule imposes no general prohibition on mining or mineral-development activities, other than the limitations imposed through the road-building prohibition. Therefore, "leasing activities not dependent on road construction, such as directional (slant) drilling and underground development," and mineral-leasing activities that could be carried out through utilization of existing roads, "would not be affected by the prohibition." 66 Fed. Reg. at 3265; *see also Wilderness Workshop*, 531 F.3d at 1224–28 (affirming the district court's holding that the Forest Service and Bureau of Land Management had not acted arbitrarily, capriciously, or not in accordance with law in approving the installation of a natural-gas pipeline across an IRA protected by the Roadless Rule; the agencies' approval was based on the

---

[18]     *See* 16 U.S.C. § 1133(d)(3) ("Subject to valid rights then existing, effective January 1, 1984, the minerals in lands designated by this chapter as wilderness areas are withdrawn from all forms of appropriation under the mining laws and from disposition under all laws pertaining to mineral leasing and all amendments thereto."); *see also Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 375 (9th Cir. 1999) (The Wilderness Act "allowed mineral exploration in designated wilderness areas to continue for twenty years after passage of the Act. . . . Subject to valid rights then existing, the minerals in the lands designated as wilderness areas were withdrawn after the expiration of the twenty years.").

32

conclusion that "there would be no violation of the Roadless Rule because the proposed [natural-gas] pipeline could be built within IRA's [sic] without road construction" (internal quotation marks omitted)).

The exceptions to the Roadless Rule's road-building prohibition would also permit new road construction or reconstruction for mineral development in certain situations. Under the exception for existing mineral leases, road construction is permitted "in conjunction with the continuation, extension, or renewal of a mineral lease on lands that are under lease by the Secretary of the Interior as of January 12, 2001[,] or for a new lease issued immediately upon expiration of an existing lease." 66 Fed. Reg. at 3272–73 (to be codified at 36 C.F.R. § 294.12(b)(7)). This exception "extends indefinitely the timeframe for which roads can be constructed on areas currently under lease." *Id.* at 3265–66. In addition, under the exception permitting road construction "as provided for by statute or treaty," *id.* at 3272 (to be codified at 36 C.F.R. § 294.12(b)(3)), "[r]easonable access to conduct exploration and development of valid claims for locatable minerals (metallic and nonmetallic minerals subject to appropriation under the General Mining Law of 1872)" would not be prohibited under the Roadless Rule. *Id.* at 3268. "Reasonable access" could "involve some level of road construction that, depending on the stage of exploration or development, could range from helicopters, temporary or unimproved roads, more permanent, improved roads, or nonmotorized transport." *Id.* In sum, the Roadless Rule is

33

less restrictive than the Wilderness Act in regard to mineral development.

These distinctions clearly demonstrate that wilderness areas governed by the Wilderness Act and IRAs governed by the Roadless Rule are not only distinct, but that the Wilderness Act is more restrictive and prohibitive than the Roadless Rule. Accordingly, we conclude that the IRAs governed by the Roadless Rule are not de facto administrative wilderness areas; therefore, the district court erred by holding otherwise.

In reaching the contrary conclusion that "uses in [IRAs] are even more restricted than those permitted in congressionally designated wilderness areas," *Wyoming*, 570 F. Supp. 2d at 1349, the district court relied heavily on one exception found in the Roadless Rule. The district court stated that

> a road could be constructed in a wilderness area to "control fire, insects, and diseases," whereas a road could only be constructed in a roadless area in the "case of an *imminent* flood, fire, or other catastrophic event that, without intervention, would cause the loss of life or property." *Compare* 16 U.S.C. § 1133(d)(1) *with* 36 C.F.R. § 294.12(b)(1).

*Id.* at 1349–50 (emphasis added). However, this distinction alone, when viewed in light of the numerous distinctions discussed above, does not demonstrate that the uses in IRAs are overall more restricted than those permitted in wilderness areas.[19] The district court's reliance on this single distinction in concluding that

---

[19] Furthermore, as the Forest Service points out, "the Wilderness Act exception [under § 1133(d)(1)] applies to a broader [and overall more restrictive] set of prohibitions." Forest Serv. Reply Br. at 9. As it explained:

(continued...)

34

the Roadless Rule is more restrictive than the Wilderness Act was erroneous.

In sum, we conclude that the Roadless Rule did not designate de facto administrative wilderness areas in contravention of the procedures set out in the Wilderness Act.

### b. Roadless Rule Was Promulgated Pursuant to Broad Authority Granted in Organic Act and MUSYA

Because we conclude that the Roadless Rule did not establish de facto wilderness areas in contravention of the procedures established in the Wilderness Act, and therefore did not usurp congressional authority under the Act, the only remaining issue is whether the Forest Service otherwise acted within its statutory authority in promulgating the Roadless Rule. We conclude that the Forest Service acted within the authority that Congress granted to it under the Organic Act and MUSYA.

As stated above, the Organic Act of 1897 empowers the Secretary of Agriculture, through the Forest Service, to "make provisions for the protection against destruction by fire and depredations upon the public forests and national

---

[19](...continued)
> For example, given the Wilderness Act's prohibition on "motorized equipment," USDA could not use a chain saw to cut a fire break in advance of a wildfire that threatened property interests, but for the statutory exception permitting measures necessary to "control . . . fire." *See* 16 U.S.C. §§ 1133(c), (d)(1). In contrast, the Roadless Rule does not ban motorized equipment in the first place.

*Id.*

forests" and "make such rules and regulations . . . to regulate [the national forests'] occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. The Organic Act gives the Forest Service broad discretion to regulate the national forests, including for conservation purposes. *See United States v. Grimaud*, 220 U.S. 506 (1911) (discussing the general authority granted under the Organic Act and upholding the Secretary of Agriculture's establishment of criminal penalties for violations of forest-wide grazing regulations); *City & Cnty. of Denver v. Bergland*, 695 F.2d 465, 476 (10th Cir. 1982) (stating that the Organic Act "confers upon the forest service the duty to protect the forests from injury and trespass, and the power to condition their use and prohibit unauthorized uses"); *United States v. Hymans*, 463 F.2d 615, 617 (10th Cir. 1972) (discussing the broad authority delegated to the Forest Service under the Organic Act to regulate the "occupancy and use" of national forests (citing *McMichael v. United States*, 355 F.2d 283 (9th Cir. 1965))); *see also Burlison v. United States*, 533 F.3d 419, 435 (6th Cir. 2008) ("Congress has given the Forest Service broad power [under the Organic Act] to regulate Forest System land." (citation omitted) (internal quotation marks omitted)); *Skranak v. Castenada*, 425 F.3d 1213, 1217 (9th Cir. 2005) (stating that "16 U.S.C. § 551 confers broad powers on the Forest Service to regulate roads for the good of the forests" (citing *Clouser v. Espy*, 42 F.3d 1522, 1538 (9th Cir. 1994))); *Wilson v. Block*, 708 F.2d 735, 758 (D.C. Cir. 1983) ("The Department of Agriculture now has adequate authority to issue

36

revocable permits for *all* purposes under the [Organic Act of] 1897." (citation omitted) (internal quotation marks omitted)); *United States v. Weiss*, 642 F.2d 296, 298 (9th Cir. 1981) ("The authority of the Secretary [of Agriculture] to regulate activity on national forest land pursuant to [16 U.S.C. § 551] has been upheld in a variety of . . . instances."); *Koniag, Inc., Vill. of Uyak v. Andrus*, 580 F.2d 601, 605 (D.C. Cir. 1978) (The "Forest Service and the Fish and Wildlife Service have broad mandates to protect our forests and wildlife." (citing 16 U.S.C. § 551)); *Mountain States Tel. & Tel. Co. v. United States*, 499 F.2d 611, 614 (Ct. Cl. 1974) (stating that the Organic Act "reveals a clear intent of Congress to commit regulation of the national forests to the discretion of the Secretary [of Agriculture]"); *McMichael*, 355 F.2d at 286 (upholding Department of Agriculture's regulations establishing primitive, wilderness, and wild areas and providing limitations upon the use to be made of such areas under the Organic Act).

The broad rulemaking authority granted the Forest Service under the Organic Act—to regulate "occupancy and use" of NFS lands and "to preserve the forests thereon from destruction" (for example, from road construction and logging)—is alone sufficient to support the Forest Service's promulgation of the Roadless Rule. *See Kootenai Tribe*, 313 F.3d at 1117 n.20 ("[T]he general rulemaking authority of the 1897 Organic Act is sufficient to support the Roadless Rule's promulgation to achieve the objects of our National Forest System."

(citing 16 U.S.C. § 551; *McMichael*, 355 F.2d 283)).  Indeed, the Forest Service

cited this authority in the final Roadless Rule.  66 Fed. Reg. at 3272 (citing 16

U.S.C. §§ 472, 551).

The Forest Service was further authorized to manage NFS lands through

MUSYA, which reaffirmed the Forest Service's authority to manage national

forests for a wide range of uses.  Specifically, MUSYA directs the Forest Service

to manage the national forests for "multiple uses," including "outdoor recreation,

range, timber, watershed, and wildlife and fish purposes."  16 U.S.C. § 528.

Congress directed the Forest Service to "mak[e] the most judicious use of the land

for some or all of these resources," and acknowledged "that some land will be

used for less than all of the resources."  *Id.* § 531(a).  Furthermore, MUSYA

states that "establishment and maintenance of areas of wilderness are consistent

with the purposes and provisions of [the Act]."  *Id.* § 529.  Congress expressly

indicated that MUSYA was "to be supplemental to, but not in derogation of," the

Organic Act.  *Id.* § 528.

As with the Organic Act, the provisions of MUSYA give the Forest Service

broad discretion to regulate NFS lands for a wide variety of purposes.  *See*

*Perkins v. Bergland*, 608 F.2d 803, 806–07 (9th Cir. 1979) (The language found

in 16 U.S.C. §§ 528, 529, and 531 "can hardly be considered concrete limits upon

agency discretion.  Rather, it is language which 'breathe(s) discretion at every

pore.'" (quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975))); *see*

38

*also United States v. New Mexico*, 438 U.S. 696, 713 (1978) ("[W]e conclude that the Multiple-Use Sustained-Yield Act of 1960 was intended to broaden the purposes for which national forests had previously been administered . . . ."). Under MUSYA's statutory scheme, which supplemented the broad authority granted in the Organic Act, Congress clearly authorized the Forest Service to regulate NFS lands for multiple uses, including those protected by the Roadless Rule, such as "outdoor recreation," "watershed," and "wildlife and fish purposes." 16 U.S.C. § 528. We therefore conclude that the Forest Service had the authority—under the Organic Act and MUSYA—to promulgate a rule protecting NFS lands through restrictions on commercial logging and road construction.[20]

---

[20] Any argument that the Wilderness Act impliedly repealed the Forest Service's general authority to regulate NFS lands for conservation purposes—that is, short of designating de facto wilderness by administrative rule—must fail. It is undisputed that Congress did not expressly repeal the general rulemaking authority granted to the Forest Service under the Organic Act and MUSYA. To the contrary, Congress explicitly stated that "[n]othing in [the Wilderness Act] shall be deemed to be in interference with the purpose for which national forests are established as set forth in [the Organic Act] and [MUSYA]." 16 U.S.C. § 1133(a)(1); *see, e.g.*, *Minn. Pub. Interest Research Grp. v. Butz*, 541 F.2d 1292, 1309 (8th Cir. 1976) ("In the Wilderness Act, Congress declared that nothing therein was to be construed to interfere with the purposes of the Multiple Use-Sustained Yield Act of 1960.")*; see also Stupak-Thrall v. United States*, 89 F.3d 1269, 1282–83 (6th Cir. 1996) (Boggs, J., dissenting) ("[T]he Wilderness Act specifically states that it is not intended to displace the Organic Act." (citing 16 U.S.C. § 1133(a)(1))). Furthermore, Congress did not otherwise demonstrate a "clear and manifest" intent to impliedly repeal the Forest Service's statutory authority to regulate NFS land for conservation purposes that stop short of "wilderness area" designations. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) ("While a later enacted statute . . . can sometimes operate to amend or even repeal an earlier statutory provision . . . ,

(continued...)

39

## C.    NEPA Claims

Wyoming asserts that the Forest Service, in promulgating the Roadless Rule, violated NEPA in seven ways.  Specifically, it argues that the Forest Service failed to comply with the NEPA requirements regarding: (1) scoping, (2) cooperating-agency status, (3) consideration of a reasonable range of alternatives in the EIS, (4) consideration of the cumulative impacts of the proposed action in the EIS, (5) preparation of a supplemental impact statement, (6) inclusion of site-specific analysis in the EIS, and (7) an objective "hard look" at the environmental consequences of agency action, by instead predetermining the outcome of the NEPA process.  The district court ruled in favor of Wyoming on all its NEPA claims except for two—the site-specific analysis claim, on which it found in favor of the Forest Service, *Wyoming*, 570 F. Supp. 2d at 1340–41, and the predetermination claim, which it did not specifically rule on.  On appeal, we consider all seven of Wyoming's NEPA claims.

### 1.    Overview of NEPA

Congress enacted NEPA in 1969.  42 U.S.C. §§ 4321–70.  The statute,

---

[20](...continued)
'repeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'" (alteration in original) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981))).  We have previously "accept[ed] the legislative history of the [Wilderness] Act as indicating its terms should not be interpreted as a general curtailment of agency discretion in the normal day-by-day administration of the national forests . . . ." *Parker v. United States*, 448 F.2d 793, 797 (10th Cir. 1971).

which has been described as "[t]he centerpiece of environmental regulation in the United States," *Forest Guardians*, 611 F.3d at 711 (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 703) (internal quotation marks omitted), requires federal agencies to integrate environmental values into the decisionmaking process by considering the environmental impacts of proposed actions and reasonable alternatives to such actions, *see, e.g.*, *Barnes v. U.S. Dep't of Transp.*, --- F.3d ----, No. 10-70718, 2011 WL 3715694, at *5 (9th Cir. Aug. 25, 2011) ("Congress passed NEPA 'to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action.'" (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005))). "NEPA established a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and promote 'the understanding of the ecological systems and natural resources important to' the United States." *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1185 (10th Cir. 2006) (alteration in original) (quoting 42 U.S.C. § 4321).

NEPA has two aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Forest*

41

*Guardians*, 611 F.3d at 711 (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)) (internal quotation marks omitted); *see also New Mexico ex rel. Richardson*, 565 F.3d at 703 ("By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions."). However, NEPA is strictly a procedural statute; it does not mandate substantive results. *E.g.*, *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008); *Utah Envtl. Cong. v. Russell*, 518 F.3d at 821.

Under NEPA, before a federal agency "undertakes a 'major Federal action[] significantly affecting the quality of the human environment,' it must prepare an environmental impact statement ('EIS') that details, among other things, the environmental impacts of the proposed action, any adverse environmental effects that would occur as a result, and alternatives to the proposed action." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (quoting 42 U.S.C. § 4332(2)(C)). Through the NEPA process, "the agency must take a 'hard look' at information relevant to its decision." *Forest Guardians*, 611 F.3d at 711. We have described the multi-stage process for preparation of an EIS as follows:

> Initially, an agency announces its intent to study a proposed action through a process called scoping, during which the agency solicits comments and input from the public and other state and federal agencies with the goal of identifying specific issues to be addressed and studied. 40 C.F.R. § 1501.7. After assessing the input from the scoping process, the government then prepares a draft Environmental Impact Statement (DEIS), *id.* § 1502.9(a),

42

which is then presented to the public and other government agencies for notice and comment. *Id.* § 1503.1(a). After evaluating the feedback received during the notice and comment process, the agency prepares a FEIS. *Id.* § 1502.9(b). If after preparing either a DEIS or FEIS, the proposed action substantially changes in a way "relevant to environmental concerns," or if new information comes to light about environmental impacts, an agency must prepare a supplemental EIS (SEIS). *Id.* § 1502.9(c)(1).

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002). In every EIS prepared under NEPA, agencies must include a "detailed statement" on:

(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). After completing the NEPA process and making a final decision on the proposed action, the agency "then must publish a record of its decision, showing how its final decision-making process incorporated the [EIS's] findings." *BioDiversity Conservation Alliance v. Bureau of Land Mgmt.*, 608 F.3d 709, 712 (10th Cir. 2010) (citing 23 C.F.R. § 771.127). The requirements of NEPA "have been augmented by longstanding regulations issued by the Council on Environmental Quality ('CEQ')." *New Mexico ex rel. Richardson*, 565 F.3d at 703; *see* 40 C.F.R. pts. 1500–08.

43

### 2. Scoping

Wyoming's first claim under NEPA alleges that the scoping period of the Forest Service was inadequate. Specifically, Wyoming argues that the Forest Service acted arbitrarily and capriciously when it failed to (a) extend the scoping period beyond the initial sixty days allotted, and (b) provide during the scoping period detailed maps of the IRAs affected by the Roadless Rule. The district court held that the Forest Service's failure to extend the scoping period and provide maps accurately depicting the areas covered by the rule was arbitrary and capricious in that it deprived Wyoming of the opportunity to "meaningfully 'participate' in determining the scope and significant issues to be analyzed in the EIS." *Wyoming*, 570 F. Supp. 2d at 1333–34. On appeal, the Forest Service argues that it fully complied with its scoping obligations under NEPA, that it was not required to extend the scoping period, and that the district court erred in finding that its failure to provide maps prevented Wyoming from meaningfully participating in the scoping process. We hold that the Forest Service fulfilled its scoping obligations under NEPA, and therefore did not act arbitrarily and capriciously.

"Scoping" is the initial phase of the overall EIS process under NEPA. *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1022. The scoping process is "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R.

44

§ 1501.7; *see Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1022 (stating that the goal of the scoping process is to "identify[] specific issues to be addressed and studied" during the EIS process (citing 40 C.F.R. § 1501.7)). To initiate the scoping process, the agency is required to publish a NOI in the Federal Register "[a]s soon as practicable after its decision to prepare an [EIS]." 40 C.F.R. § 1501.7. As part of this process, the lead agency is required to, *inter alia*, "[i]nvite the participation of affected Federal, State, and local agencies" and "[d]etermine the scope . . . and the significant issues to be analyzed in depth in the [EIS]." *Id.* § 1501.7(a)(1), (2).

In addition, the agency "*may* . . . [s]et time limits" for the scoping process and "[h]old an early scoping meeting or meetings." *Id.* § 1501.7(b)(2), (4) (emphasis added). In regard to setting time limits for the scoping process, the only requirement is that such limits comply with 40 C.F.R. § 1501.8. *Id.* § 1501.7(b)(1). Section 1501.8 does not "prescribe[] universal time limits for the entire NEPA process," but instead merely authorizes agencies to set time limits—including times limits on the scoping process—that are "appropriate to individual actions" and "are consistent with the purposes of NEPA and other essential considerations of national policy." *Id.* § 1501.8. More specifically, the principal regulations governing scoping—i.e., the CEQ Regulations—do not set minimum time limits for the scoping period and do not require an agency to extend or reopen the scoping period; those determinations are generally left to the

agency's discretion.

In accordance with 40 C.F.R. § 1501.7, the Forest Service published a NOI commencing the scoping period for the Roadless Rule on October 19, 1999. 64 Fed. Reg. at 56,306. The NOI stated that the "Forest Service is initiating a public rulemaking process to propose the protection of remaining roadless areas within the [NFS]." *Id.* The scoping period for the proposed rulemaking was to close on December 20, 1999, sixty days after it opened. *Id.* The NOI gave an overview of the proposed rulemaking, *see id.* at 56,307 (stating that the "Forest Service proposes to promulgate a [two-part] rule" that would "restrict certain activities, such as road construction, in unroaded portions of [IRAs]" and "establish national direction for managing inventoried roadless areas, and for determining whether and to what extent similar protections should be extended to uninventoried roadless areas"); listed the possible alternatives that would be considered in the DEIS, *see id.* (listing the four alternatives, including the "no action" alternative); and gave a tentative timeline for completion of the overall NEPA process, *see id.* (stating that the "[DEIS] and proposed rule are expected . . . in Spring 2000, and a [FEIS] and final rule will follow"). The NOI did not indicate the existence of any maps depicting the geographic scope of the Roadless Rule, but it did indicate that the proposed rule would apply to "unroaded portions of inventoried roadless areas, as previously identified in RARE II and existing forest plan inventories." *Id.*

Turning to the Forest Service's refusal to extend the scoping period, we conclude that it was not unreasonable—that is, not arbitrary, capricious, or an abuse of discretion—to limit the period to sixty days and to decline to extend it any further. As stated above, there is no requirement mandating a minimum number of days the scoping period must remain open or requiring the Forest Service to extend or reopen the scoping period. We have found that "[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and methods of inquiry permitting them to discharge their multitudinous duties." *Phillips Petroleum Co. v. U.S. EPA*, 803 F.2d 545, 559 (10th Cir. 1986) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 543 (1978)) (internal quotation marks omitted). "Congress intended that the discretion of the agencies and not that of the courts be exercised in determining when extra procedural devices should be employed." *Id.* (emphasis omitted) (quoting *Vt. Yankee*, 435 U.S. at 546) (internal quotation marks omitted). Therefore, as long as the agency complies with the statutory and regulatory minima, absent "extremely compelling circumstances," a reviewing court generally may not overturn an agency decision for failure to provide additional procedure, *Vt. Yankee*, 435 U.S. at 543; "such [extreme] circumstances, if they exist, are extremely rare." *Id.* at 524.

Nothing in NEPA or the CEQ Regulations (or the APA for that matter)

47

required the Forest Service to extend the scoping period beyond the initial sixty-day allotment; Wyoming itself acknowledges this. *See* Wyo. Br. at 16 ("Wyoming agrees that the NEPA scoping regulations do not specifically require . . . extensions of the scoping period upon request."). To impose upon the agency more stringent requirements than the legal framework requires, absent "extremely compelling circumstances," would violate the well-settled principle articulated by the Supreme Court in *Vermont Yankee* "that the formulation of procedure is to be basically left within the discretion of the agencies to which Congress has confined the responsibility for substantive judgments." *Phillips Petroleum*, 803 F.2d at 559. Because Wyoming has cited to no "extremely compelling circumstance" that would justify our intrusion, we conclude that the agency's refusal to extend the comment period was not arbitrary, capricious, or an abuse of discretion. *See, e.g.*, *id.* (applying *Vermont Yankee* and holding that the EPA did not act arbitrarily and capriciously under the APA in "refusing to extend the [45-day] comment period 30 days" because "[t]here [wa]s no requirement concerning how many days the EPA must allow for comment or that the EPA must re-open the comment period at the request of one of the participants"); *cf. Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 534 (D.C. Cir. 1982) (holding that the Nuclear Regulatory Commission's refusal to extend the minimum comment period under the APA was not "unreasonable" because "[n]either statute nor regulation mandates that the agency do more," even though a "longer comment period might

48

have been helpful" due to the "technical complexity of the regulations").[21]

The district court likewise erred in holding that the Forest Service's failure to present detailed maps of the areas impacted by the Roadless Rule during the scoping period was arbitrary and capricious. The district court found that the Forest Service violated NEPA by failing to provide "maps accurately depicting the areas covered by the Roadless Rule" because without such maps "Wyoming could not meaningfully participate in defining the scope of a rule when it did not know what lands within its borders would be impacted by the rule." *Wyoming*, 570 F. Supp. 2d at 1333. Again, we disagree with the district court's conclusion that the Forest Service's refusal to provide such information was arbitrary, capricious, or an abuse of discretion.

As Wyoming acknowledges, neither NEPA's provisions nor the CEQ Regulations require an agency to include detailed maps or a precise geographic description of the areas potentially affected by a proposed rule during the scoping

---

[21] In any event, we are convinced that Wyoming was given a meaningful opportunity to participate in the scoping process. A review of the record demonstrates that the Forest Service's sixty-day scoping period was adequate because of the substantial input the Forest Service was able to obtain during that period. The Forest Service conducted 187 public meetings, several of which were held in Wyoming, and received approximately 517,000 comments during the sixty days. It is virtually certain that this process produced more than enough information to "[d]etermine the scope . . . and the significant issues to be analyzed in depth in the [EIS]." 40 C.F.R. § 1501.7(a)(2).

process. 40 C.F.R. § 1501.7.[22] Furthermore, Wyoming's assertion—and the district court's conclusion—that the failure to provide maps deprived Wyoming of an opportunity to meaningfully participate in the scoping process because it could not determine which areas would be affected is wholly without merit. A review of the record demonstrates that Wyoming had adequate notice of the unroaded areas within their borders that would be affected by the proposed rule, which in turn enabled Wyoming to meaningfully participate in the scoping process. *See Kootenai Tribe*, 313 F.3d at 1116–17 ("The primary purpose of the scoping period is to notify those who may be affected by a proposed government action which is governed by NEPA that the relevant entity is beginning the EIS process; this notice requirement ensures that interested parties are aware of and therefore are able to participate meaningfully in the entire EIS process, from start to finish." (citing *Nw. Coal. for Alts. to Pesticides (NCAP) v. Lyng*, 844 F.2d 588, 594–95 (9th Cir. 1988))).

First, the Forest Service displayed preliminary versions of the Roadless Rule maps at the scoping meetings, including the meetings in Wyoming. *See* Aplt. App. at 312–13 (Baron Decl., dated Feb. 28, 2003) (stating that preliminary

---

[22] Wyoming argues that the "[scoping regulations] *do* require that environmental information of 'high quality' be made available to public officials and citizens 'before decisions are made and before actions are taken.'" Wyo. Br. at 16–17 (emphasis added) (quoting 40 C.F.R. § 1500.1(b)). However, because § 1500.1(b) is not a scoping regulation, and must only be satisfied "before decisions are made and before actions are taken," it is not relevant to the scoping issue.

maps were presented at scoping meetings in Wyoming, which displayed rough depictions of the RARE II IRAs located within Bighorn, Bridger-Teton, Medicine Bow, Shoshone, and Ashley National Forests, as well as the Thunder Basin National Grassland); *id.* at 2023–26 (large-scale copies of Geographic Information System ("GIS") maps depicting RARE II IRAs in Bighorn, Bridger-Teton, and Medicine Bow National Parks, which were displayed at scoping meetings in Wyoming). These maps, although not depicting the precise boundaries of the rule's geographic scope, gave Wyoming sufficient notice as to which IRAs within its borders would generally be impacted by the rule. Second, even without the maps, Wyoming was aware of the IRAs that would be impacted because the NOI indicated that the rule would "restrict certain activities . . . in unroaded portions of inventoried roadless areas, as previously identified in RARE II and existing forest plan inventories." 64 Fed. Reg. at 56,307. This description alone reasonably informed the public, including Wyoming, of which IRAs would be affected by the rule. The notice provided by the preliminary maps and also the NOI's reference to IRAs identified in the RARE II and existing forest plan inventories were more than sufficient to allow Wyoming to meaningfully participate in the initial scoping phase of the EIS process; that is, sufficient to allow them to meaningfully participate in the "early and open process for determining the scope of issues to be addressed and for identifying the significant

51

issues related to a proposed action." 40 C.F.R. § 1501.7.[23] Accordingly, we hold that the district court erred in holding that the Forest Service's failure to provide more detailed maps during the scoping period was arbitrary and capricious.

### 3. Cooperating-Agency Status

In February of 2000, early in the NEPA process, Wyoming requested the Forest Service to grant it "cooperating agency" status under the CEQ Regulations. The Forest Service never responded, thereby impliedly rejecting or denying Wyoming's request. The district court concluded that, although administrative agencies generally have "the discretion to grant or deny the states cooperating agency status," the Forest Service acted arbitrarily and capriciously in denying Wyoming's request because "[t]here is not one good reason in the administrative record before the Court explaining why cooperating-agency status was denied to

---

[23] In reviewing a similar challenge to the Forest Service's failure to provide maps during the scoping process for the Roadless Rule EIS, the Ninth Circuit held that "the Forest Service met its obligations under NEPA for the scoping period." *Kootenai Tribe*, 313 F.3d at 1117. The *Kootenai Tribe* court "disagree[d] with the district court and plaintiffs that the Forest Service's failure to provide maps of the affected areas during [the scoping] period violated NEPA." *Id.* This holding was based in part on the court's conclusion that "the location of the affected areas was reasonably known to the plaintiffs prior to the receipt of the maps because the plaintiffs ha[d] been engaged in ongoing studies and discussions with the Forest Service about roadless areas for several years." *Id*; *see id.* (stating that even if the maps presented by the Forest Service were "less than ideal, plaintiffs cannot seriously dispute that they had actual notice as to the roadless areas that would be affected, by virtue of their prior contact with the Forest Service"). Although certainly not binding on this court, the *Kootenai Tribe* decision does lend support to our holding that the Forest Service was not required to provide more detailed maps of the affected IRAs during the scoping process.

52

the ten most affected states, including Wyoming." *Wyoming*, 570 F. Supp. 2d at 1334–35.  On appeal, the Forest Service and the Environmental Groups argue that the district court erred because the Forest Service's decision to grant or deny a request for cooperating-agency status is committed solely to the agency's discretion and not subject to judicial review under the APA.  We agree.

All agency actions are presumed reviewable under the APA.  *Payton v. U.S. Dep't of Agric.*, 337 F.3d 1163, 1167 (10th Cir. 2003).  However, there is a narrow exception to this otherwise strong presumption, found in 5 U.S.C. § 701(a)(2), which precludes review "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Id.* at 1168 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)) (internal quotation marks omitted).  "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely."  *City of Colo. Springs v. Solis*, 589 F.3d 1121, 1129 (10th Cir. 2009) (quoting *Heckler*, 470 U.S. at 830) (internal quotation marks omitted).  In other words, where the statutory and regulatory frameworks yield no law to apply, there can be no judicial review under the APA.  *Id.* (citing *Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 642 (10th Cir. 1990)).  In ascertaining whether there is "law" or a "meaningful standard" to apply to a challenged action, the court may look to the applicable statutes, regulations, or other binding agency rules.  *E.g.*, *Solis*, 589 F.3d at 1129–30; *McAlpine v. United States*, 112 F.3d 1429, 1433 (10th

53

Cir. 1997).

The CEQ Regulations state that "[u]pon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency." 40 C.F.R. § 1501.6. A "cooperating agency" is defined as "any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment." *Id.* § 1508.5. A non-federal agency, such as a State or local agency, "*may* request the lead agency to designate it a cooperating agency," *id.* § 1501.6 (emphasis added), and "*may* by agreement with the lead agency become a cooperating agency," *id.* § 1508.5 (emphasis added).

Although it is true that the CEQ Regulations permit Wyoming to request cooperating-agency status from the Forest Service, and further authorize the agency to grant such status, nothing in the regulations mandates or requires that the Forest Service grant such a request. More importantly, the applicable regulations provide no standard for a court to apply in reviewing the Forest Service's denial of such a request, and are likewise devoid of any standards or directives that would guide the Forest Service in granting or denying such a request. In other words, there is simply no law to apply. *Cf. Solis*, 589 F.3d at 1130 (concluding that there *is* "law to apply" when the applicable legal framework provides "clear and specific directives" to guide the agency in making

54

the determination (internal quotation marks omitted)).  Under the applicable legal framework, therefore, the decision to grant or deny Wyoming's request was committed to the Forest Service's discretion and is not judicially reviewable under the APA.  Accordingly, the district court erred in finding that the Forest Service's implied denial of Wyoming's request was arbitrary and capricious.[24]

### 4. Alternatives Analysis

Wyoming and CMA also claim that the Forest Service violated NEPA by failing to adequately consider a reasonable range of alternatives to the proposed action.  More specifically, they argue that the Forest Service impermissibly defined the purpose of the proposed action too narrowly, which therefore precluded consideration of a reasonable range of alternatives.  The district court,

---

[24]    Wyoming argues that a "meaningful standard" emanates from the "policy" provision of NEPA, 42 U.S.C. § 4331, as well as from a memorandum issued by the CEQ in 1999.  *See* 42 U.S.C. § 4331(a) (stating that it is the "policy" of the Federal Government under NEPA to work "in cooperation with State and local governments"); *id.* § 4331(b) (stating that "it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources"); Aplee. Supp. App. at 153–55 (Memorandum from George T. Frampton, Council on Envtl. Quality, to the Heads of Federal Agencies, dated July 28, 1999) ("urg[ing] agencies to more actively solicit in the future the participation of state, tribal and local governments as 'cooperating agencies' in implementing the [EIS] process under [NEPA]" (citing 40 C.F.R. § 1508.5)).  However, this argument fails for two reasons.  First, neither § 4331 nor the memorandum set out "clear and specific directives" for the agency or the court to apply.  *See Solis*, 589 F.3d at 1130.  Second, neither of these sources establish binding legal duties that limit the Forest Service's discretion in granting or denying a request.  *E.g.*, *Sierra Club v. Yeutter*, 911 F.2d 1405, 1414 (10th Cir. 1990).

finding in favor Wyoming and CMA, held that the Forest Service violated NEPA because it "failed to rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action, which "was the result of the agency narrowly defining the scope of its project" thereby "eliminat[ing] competing alternatives out of consideration and existence." *Wyoming*, 570 F. Supp. 2d at 1339–40. On appeal, the Forest Service and the Environmental Groups argue that the Forest Service reasonably limited the range of alternatives to those that furthered the defined purpose of the Roadless Rule—*viz.*, to prohibit activities, such as road construction and timber harvest, that have the greatest likelihood of degrading the characteristics of IRAs—and thereafter satisfied NEPA's requirements by analyzing a full range of reasonable alternatives that would satisfy that purpose. We agree.

### a. NEPA's Alternatives-Analysis Mandate

Under NEPA, an EIS prepared by a federal agency must include a discussion of "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C). The analysis of alternatives "is characterized as 'the heart' of the environmental impact statement." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (quoting 40 C.F.R. § 1502.14). In the EIS, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" in response to a "specif[ied] . . . purpose and need." 40 C.F.R. §§ 1502.13, 1502.14(a); *see also New Mexico ex rel. Richardson*, 565 F.3d at 703 (stating that

"an EIS must 'rigorously explore and objectively evaluate' all reasonable alternatives to a proposed action, in order to compare the environmental impacts of all available courses of action" (quoting 40 C.F.R. § 1502.14)).

"We review an EIS under a 'rule of reason' standard to determine . . . whether the discussion of alternatives in the EIS is sufficient to permit a reasoned choice among the options." *Ass'ns Working for Aurora's Residential Env't (AWARE) v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998); *see also Colo. Envtl. Coal.*, 185 F.3d at 1174 (stating that, when evaluating the adequacy of an agency's alternatives analysis, we employ a "rule of reason"); *BioDiversity Conservation Alliance*, 608 F.3d at 714 ("Our review of a decision not to consider a particular alternative is informed by a rule of reason and practicality."). The "reasonableness standard applies both to which alternatives the agency discusses and the extent to which it discusses them." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166–67 (10th Cir. 2002) (citing *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994)).

We have held that "[o]nce an agency appropriately defines the objectives of an action, NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030 (quoting *All Indian Pueblo Council v. United States*,

57

975 F.2d 1437, 1444 (10th Cir. 1992)) (internal quotations marks omitted).  That

is, once an agency establishes the objective of the proposed action—which it has

considerable discretion to define, *Utah Envtl. Cong. v. Bosworth*, 439 F.3d at

1195; *see also Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir.

1998) (stating that agencies have "considerable discretion to define the purpose

and need of a project," as long as it is reasonable)—the agency need not provide a

detailed study of alternatives that do not accomplish that purpose or objective, as

those alternatives are not "reasonable," *Citizens' Comm. to Save Our Canyons*,

297 F.3d at 1031; *see also BioDiversity Conservation Alliance*, 608 F.3d at

714–15 ("An environmental impact statement must study reasonable alternatives

in detail. . . .  The Bureau may eliminate alternatives that are 'too remote,

speculative, impractical, or ineffective,' or that do not meet the purposes and

needs of the project." (citation omitted) (quoting *New Mexico ex rel. Richardson*,

565 F.3d at 708–09 & n.30)); *AWARE*, 153 F.3d at 1130 ("[A]n agency need not

independently evaluate alternatives it determines in good faith to be ineffective as

a means to achieving the desired ends.").  However, agencies are not permitted

"to define the objectives [of a proposed action] so narrowly as to preclude a

reasonable consideration of alternatives."  *Citizens' Comm. to Save Our Canyons*,

297 F.3d at 1030; *see also Utah Envtl. Cong. v. Bosworth*, 439 F.3d at 1184

(stating that an agency cannot "define the project so narrowly that it foreclose[s]

a reasonable consideration of alternatives" (quoting *Davis v. Mineta*, 302 F.3d

1104, 1119 (10th Cir. 2002)) (internal quotation marks omitted)).

For the alternatives selected for detailed analysis in the EIS, the agency must "[d]evote substantial treatment to each alternative . . . including the proposed action so that reviewers may evaluate their comparative merits."  40 C.F.R. § 1502.14(b).  Within the detailed alternatives analysis, agencies are also required to "[i]nclude the alternative of no action."  *Id.* § 1502.14(d); *accord Forest Guardians*, 611 F.3d at 711.  For those "alternatives which were eliminated from detailed study" in the EIS—for example, because such alternatives do not further the defined purpose of the proposed action—the agency must "briefly discuss the reasons for their having been eliminated."  *Utahns for Better Transp.*, 305 F.3d at 1166 (quoting 40 C.F.R. § 1502.14(a)) (internal quotation marks omitted).

### b.     Discussion

As stated above, agencies have considerable discretion to define the purposes and objectives of a proposed action, as long as they are reasonable. *Utah Envtl. Cong. v. Bosworth*, 439 F.3d at 1195; *Friends of Se.'s Future*, 975 F.3d at 1066.  In this action, the Forest Service stated that the defined purpose of the Roadless Rule was, *inter alia*, to provide long-term "protect[ion] [of] the values prevalent in roadless areas" by "immediately stop[ping] activities that have the greatest likelihood of degrading desirable characteristics of [IRAs]."  DEIS at 1-10; *see also* FEIS at ES-1 ("The purpose of this action is to immediately stop

59

activities that pose the greatest risks to the social and ecological values of [IRAs].").  Although the district court concluded otherwise, we do not find this stated purpose to be unreasonably narrow, in that it would preclude reasonable consideration of alternatives.  *See Kootenai Tribe*, 313 F.3d at 1122 (stating that "[p]rotecting the roadless areas of our national forests from further degradation," the defined objective of the Roadless Rule, "can hardly be termed unreasonably narrow").

To achieve the defined purpose of the proposed rule, "the agency determined that only those uses and activities that are likely to significantly alter landscapes and cause landscape fragmentation on a national scale [would] be considered for prohibition in this proposal."  DEIS at 1-10.  Specifically, the Forest Service decided—based on the stated purpose of the action and a review of public commentary—to limit the alternatives analyzed in detail to those that prohibited road construction and reconstruction, in addition to the "no action" alternative.  *Id.*

Within this established scope, the Forest Service analyzed four prohibition alternatives in detail in the EIS: three "action" alternatives and the "no action alternative."  Alternative 1 was the "no action" alternative, DEIS at 2-4, under which "no rule prohibiting activities in [IRAs] would be issued" and "[c]urrent management plans would continue to guide forest and grassland management."  FEIS at ES-5.  Alternative 2, which was the preferred alternative identified in the

60

DEIS, proposed a prohibition on "road construction and reconstruction within unroaded portions of [IRAs]," with no explicit restriction on timber harvest. DEIS at 2-4 to 2-5; FEIS at 2-6 to 2-7. Alternative 3, which was the preferred alternative in the FEIS, proposed a prohibition on "road construction, reconstruction, and timber harvest except for stewardship purposes within unroaded portions of [IRAs]." DEIS at 2-5; FEIS at 2-7. Lastly, Alternative 4 proposed a prohibition on "road construction, reconstruction[,] and all timber harvest within unroaded portions of [IRAs]," with no stewardship exception. DEIS at 2-6; FEIS at 2-8.

The Forest Service explained that it was limiting the action alternatives to restrictions on

> road construction, reconstruction, and timber harvest, because these activities occur on a national scale, have the greatest likelihood of altering landscapes, often cause significant landscape fragmentation, and often result in immediate, irreversible, and long-term loss of roadless characteristics. In addition, timber harvest historically generates the need for most of the road construction in inventoried roadless areas.

DEIS at 1-10 to 1-11. We conclude that the Forest Service's decision to limit the alternatives considered in detail to those that focused on restrictions on road construction and timber harvest (as well as the required "no action" alternative) was reasonable in light of its conclusion, based on ample evidence presented in the EIS, that these activities posed the greatest risk of destroying the characteristics of IRAs, which the proposed rule was intended to protect and

61

preserve.

The district court faulted the Forest Service for only considering alternatives that prohibited road construction, based on the court's finding that Defendants had not "directed the Court to any evidence considered by the Forest Service to support th[e] conclusory premise" that "any road construction whatsoever would degrade the desirable characteristics of [IRAs] in contravention of the purpose of the Roadless Rule." *Wyoming*, 570 F. Supp. 2d at 1339. However, this finding was clearly erroneous; the record is replete with evidence supporting the Forest Service's decision to sharply limit road construction in each of the action alternatives analyzed in the EIS.

For example, the Forest Service explained that road construction and reconstruction in IRAs, which occur within IRAs on a nationwide basis: (a) create "the greatest likelihood of altering landscapes," "[o]ften cause substantial landscape fragmentation and adverse changes to native plant and animal communities," and can "result in immediate, irretrievable, and long-term loss of roadless characteristics," FEIS at 1-16; (b) are "the primary human-caused source of soil and water disturbances in forested environments," *id.* at 3-44; (c) "contribute more sediment to streams than any other land management activity," *id.* at 3-165; (d) are "major contributors to forest fragmentation" and the associated disturbance of important wildlife habitat, *id.* at 3-131 to 3-133; (e) "convert[] large areas of habitat into nonhabitat" and "negative[ly] [a]ffect[] . . .

62

both terrestrial and aquatic ecosystems," *id.* at 3-149 to 3-150; (f) create "avenues for invasion by nonnative invasive plant species that frequently compete with or displace native vegetation," *id.* at 3-174; and (g) adversely impact threatened and endangered wildlife species, through habitat loss, loss of connectivity with other habitats, displacement, and access for poaching and illegal collection, *see id.* at 3-181 to 3-182. A review of this evidence, among other evidence presented in the DEIS and FEIS, supports the Forest Service's judgment that a near-total ban on road construction was a necessary component of a rule with the goal of protecting and preserving the characteristics of IRAs. *See Kootenai Tribe*, 313 F.3d at 1122 ("[H]aving considered additional alternatives in a preliminary manner, the Forest Service could reasonably conclude that only a near total ban on road construction in roadless areas could satisfy [the] policy objectives [of the Roadless Rule].").

Unlike the district court, we will defer to the Forest Service's judgment on this issue. *Cf., e.g.*, *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010) (stating that under NEPA "our 'deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise'" (quoting *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008))). Accordingly, we find that the Forest Service reasonably limited the detailed alternatives analysis to the three alternatives—in addition to the required "no action" alternative—that prohibited road construction, because any alternative permitting road construction to a

63

greater extent would not further the defined objective of the Roadless Rule and would therefore not be "reasonable." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1031; *see also AWARE*, 153 F.3d at 1130.[25]

The district court's holding that the Forest Service failed to satisfy its NEPA mandate was also based on several other conclusions, which we find to be erroneous. First, the district court erred in finding that the Forest Service had considered only two action alternatives. As discussed above, the Forest Service took the requisite "hard look" at four alternatives—the three "action" alternatives and the required "no action" alternative. The district court found that Alternative 2 and Alternative 4 would have the same practical effect of eliminating all logging, in addition to banning road construction and reconstruction, and were therefore essentially identical. *Wyoming*, 570 F. Supp. 2d at 1337–38. However, the record demonstrates otherwise. Contrary to the district court's conclusion, Alternative 2—which generally banned road construction and reconstruction, but not timber harvest—would not preclude all logging because it would allow the continued use of existing roads, helicopters, and cable systems to extract timber from IRAs. *See* FEIS at 2-7, 3-197, 3-201 to 3-202. The Forest Service estimated

---

[25] The Tenth Circuit has repeatedly held that agencies may limit their alternatives to the no-action alternative and alternatives that meet the defined purpose or objective of the proposed action. *See, e.g.*, *Utah Envtl. Cong. v. Bosworth*, 439 F.3d at 1187, 1195; *Greater Yellowstone Coal.*, 359 F.3d at 1278; *Lee v. U.S. Air Force*, 354 F.3d 1229, 1238–40 (10th Cir. 2004); *Citizen's Comm. to Save Our Canyons*, 297 F.3d at 1031–32; *Colo. Envtl. Coal.*, 185 F.3d at 1174–75; *AWARE*, 153 F.3d at 1130.

that Alternative 2 would permit approximately 300 million board feet of timber to be harvested from approximately 40,000 acres of IRAs in the first five years following the rulemaking. *Id.* at 3-201 to 3-203. By contrast, Alternative 4—which generally banned road construction and timber harvest, with no stewardship exception—would prohibit all logging and yield no timber volume. *Id.* at 3-204. The record demonstrates that these two alternatives were not "essentially identical," and therefore the Forest Service was correct in analyzing them in the EIS as separate and distinct alternatives.

Second, the district court erred in finding that the Forest Service failed to consider other alternatives, aside from the four alternatives considered in detail. *Wyoming*, 570 F. Supp. 2d at 1338. As discussed *supra*, "an agency need not independently evaluate alternatives it determines in good faith to be ineffective as a means to achieving the desired ends." *AWARE,* 153 F.3d at 1130. For those alternatives considered but eliminated from detailed analysis, the Forest Service was required only to "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). During the NEPA process, the Forest Service considered six other categories of alternatives—which included exempting road construction for fire, insect, and disease treatments and for forest health management—but eliminated them from detailed study. FEIS at 2-15 to 2-

22.[26] In accordance with the requirements under NEPA, the Forest Service briefly explained its reasons for eliminating these other alternatives from detailed study, stating that they "were outside the scope of conserving and protecting inventoried roadless areas, [were] already represented by one or more of the alternatives considered in detail, or it was determined that they would cause unnecessary environmental harm." FEIS at 2-15; *see also id.* at 2-15 to 2-22 (individually dismissing these other alternatives and stating the Forest Service's reason for not considering each alterative in detail). Under NEPA, we conclude that nothing more was required with respect to these additional alternatives.[27]

The district court also erred in finding that the Forest Service failed to consider the benefits of road building or the environmental impacts of prohibiting

---

[26] Specifically, these six other "categories" of alternatives included: (1) "processes other than rulemaking for attaining the purpose of this action"; (2) "land use designations"; (3) "prohibitions"; (4) "geographical definitions"; (5) "durations for prohibitions and procedures"; and (6) "exemptions and exceptions." FEIS at 2-15.

[27] The district court complained that "the Forest Service stated that it did not consider various components of the alternatives . . . because it would create an 'unmanageably large number of alternatives.'" *Wyoming*, 570 F. Supp. 2d at 1338. We disagree with this characterization of the Forest Service's statement. The Forest Service actually stated that a "wide variety of factors . . . [were] *considered in detail*" during the scoping period and that "[s]ince the DEIS was released, many additional suggestions have been offered *and explored* in arriving at the set of alternatives considered in detail." FEIS at 2-15 (emphasis added). Although the Forest Service had considered each of the alternatives, it stated that addressing each of these alternatives individually in detail in the FEIS would be "unmanageabl[e]." *Id.* As stated above, we conclude that nothing more was required as to these eliminated alternatives.

road building in the EIS. Specifically, the district court stated that there is "nothing unreasonable about studying in detail an alternative that would permit the construction of a road into a roadless area to protect the forest through active forest management," and the court disapproved of what it considered the Forest Service's "cavalier dismissal of such forest management activities, which have been the environmental status quo for decades." *Wyoming*, 570 F. Supp. 2d at 1339.

Turning to the problems with the district court's findings, first, as discussed above, the Forest Service considered active forest management as an exception to the general prohibitions on road building in the proposed rule, but dismissed such an exception because the agency reasonably determined that these forest management "activities could lead to widespread road construction in many roadless areas that would be incompatible with the stated purpose and need" of the proposed rule. FEIS at 2-22. In addition, the Forest Service also analyzed the environmental effects and benefits of forest management activities in detail under the "no-action" alternative. *See generally id.* at 3-72 to 3-123 (analyzing "Forest Health and Fire Ecology").[28] For example, under Alternative 1, the Forest Service

---

[28]    The district court itself characterized these forest management activities as the "environmental status quo" that had been in place "for decades." *Wyoming*, 570 F. Supp. 2d at 1339. We have explained that the purpose of the "no action" alternative—which agencies are required to consider, 40 C.F.R. § 1502.14(d)—is to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining *the status quo*." *Custer Cnty. Action*

(continued...)

67

analyzed in detail the use of "fuel management" and "fire suppression" practices, *see id.* at 3-76 to 3-93, as well as management practices used to reduce the risk of insect and disease infestation in order to protect and improve forest health, *see id.* at 3-116 to 3-120; *see also id.* at 3-19 to 3-20 (analyzing the use of "Active and Passive Forest Management," and stating that "[t]he Forest Service recognizes that some management activity may be needed to achieve the most desirable ecological conditions in roadless areas," but that such "management activities can be achieved in the absence of roads"). After reviewing the record, we therefore conclude that the Forest Service took a "hard look" at the forest management activities, which the district court mistakenly asserted that the Forest Service so "cavalier[ly] dismiss[ed]." *Wyoming*, 570 F. Supp. 2d at 1339.[29]

[28](...continued)
*Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (emphasis added). Therefore, it follows that the Forest Service's detailed analysis of the "no action" alternative evaluated exactly what the district court faulted the agency for "cavalier[ly] dismiss[ing]"—the status quo, which included active forest management carried out at the local level.

[29]     For the first time on appeal, CMA argues that the Forest Service violated NEPA by failing to "fully evaluate the adverse economic and social effects of the proposed action." CMA Br. at 18–23; *see* 40 C.F.R. § 1508.8 (defining "effects" of a proposed action to include "ecological . . . , aesthetic, historic, cultural, *economic, social*, or health, whether direct, indirect, or cumulative" (emphasis added)). However, this argument is without merit. The Forest Service addressed CMA's concerns about socio-economic impacts regarding mineral extraction and leasing in the EIS. *See*, *e.g.*, FEIS at 2-8 to 2-9 (addressing "social and economic mitigation measures"); *id.* at 3-308 to 3-324 (evaluating the social and economic impacts that the proposed rule would have on "energy and non-energy minerals" development); *id.* at 3-252 to 3-264

(continued...)

Lastly, the district court erred in finding that the Forest Service improperly "eliminated . . . reasonable alternatives" when it moved the procedural aspect of the Roadless Rule to the 2000 Planning Regulations. *Wyoming*, 570 F. Supp. 2d at 1339. The district court stated that "alternatives that were eliminated from consideration in the draft EIS on the grounds that the procedural aspect of the Roadless Rule precluded further examination, should have been reevaluated" after the Forest Service moved the procedural requirements to the Planning Regulations. *Id.*; *see also id.* (stating that the "range of alternatives considered by the Forest Service was inadequate . . . [b]ecause the nature and scope of the proposed action materially changed between the [DEIS] and [FEIS], and the agency failed to update the list of alternatives it considered to reflect those changes").

The only alternatives discussed by the district court that were supposedly

---

[29](...continued)
(addressing the impacts of the proposed rule on "minerals and geology"); *see also id.* at 3-326 to 3-350 (evaluating the social and economic impacts of the rule on "forest-dependent communities"). Furthermore, in response to concerns regarding the impacts of the Roadless Rule on mineral extraction, the Forest Service included an exception to allow road construction "in conjunction with the continuation, extension, or renewal of a mineral lease." 66 Fed. Reg. at 3256 (to be codified at 36 C.F.R. § 294.12(b)(7)); *see id.* at 3265 ("Existing mineral leases are not subject to the [Roadless Rule's] prohibitions, nor is the continuation, extension, or renewal of an existing mineral lease . . . . Additionally, road construction or reconstruction may be authorized for new leases on these same lands in the event that application for a new lease is made prior to termination or expiration of the existing lease."); *see also* FEIS at 2-9 (stating that the mineral-lease exception "was added in response to comments regarding the impacts the prohibition on road construction may have on future mineral leasing").

"eliminated from [detailed] consideration in the [DEIS] on the grounds that the procedural aspect of the Roadless Rule precluded further examination" were the so-called "mineral withdrawal exemptions." *Id.* at 1338 (stating that the "mineral withdrawal exemptions were eliminated from study because such activities could be proposed through the implementation of the procedural alternatives, i.e., through proposals to local forest managers"). However, despite the district court's conclusion that "the Forest Service did not reevaluate the need for mineral withdrawal exemptions," the record demonstrates otherwise.

In the FEIS, which reflected the agency's environmental analysis *after* the procedural aspects had been moved to the Planning Regulations, the Forest Service reconsidered the "mineral withdrawal" alternatives discussed by the district court and reiterated its conclusion, similarly stated in its DEIS, that "[w]ithdrawal of [IRAs] from mining was considered but was dismissed from detailed study" because "[t]he potential impacts to roadless values from mining activities . . . are not believed to be significant and widespread on a national level" and it would "be difficult to accomplish [specific mining requirements] in a proposal of national scope." FEIS at 2-19. The Forest Service further reiterated in the FEIS that "mineral withdrawals for specific [IRAs] could be proposed in compliance with Department of the Interior rules and procedures," *id.*, as opposed to "the procedural alternatives" referenced in the DEIS, DEIS at 2-19. We fail to see how this demonstrates that the Forest Service eliminated reasonable

70

alternatives from its alternatives analysis.

Furthermore, contrary to the district court's apparent conclusion that the Forest Service failed to "reevaluate the need for mineral withdrawal exemptions," as discussed above, *see supra* note 29, the Forest Service analyzed in detail the impacts of the proposed action on mining, mineral leasing, and the related social and economic impacts in the FEIS, and also added an exception to allow road construction "in conjunction with the continuation, extension, or renewal of a mineral lease." 66 Fed. Reg. at 3256 (to be codified at 36 C.F.R. § 294.12(b)(7)); *see* FEIS at 2-9 (stating that the mineral-lease exception "was added in response to comments regarding the impacts the prohibition on road construction may have on future mineral leasing").

In sum, we conclude that the Forest Service considered a reasonable range of alternatives in detail in the EIS, and reasonably rejected those alternatives that did not further the defined purpose of the Roadless Rule. In doing so, "the agency gathered 'information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned,'" *Greater Yellowstone Coal.*, 359 F.3d at 1277 (quoting *Colo. Envtl. Coal.*, 185 F.3d at 1174), which "enable[d] the Forest Service to take a hard look at the environmental impacts of the proposed [rule] and its alternatives." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1031 (quoting *Colo. Envtl. Coalition*, 185 F.3d at 1174) (internal quotation marks omitted). Nothing more was required under NEPA. We

71

therefore hold that the district court erred in concluding that the "promulgation of the Roadless Rule was not in accordance with law because the agency failed to rigorously explore and objectively evaluate all reasonable alternatives." *Wyoming*, 570 F. Supp. 2d at 1340.

### 5.    Cumulative Impacts

Wyoming next claims that the Forest Service violated NEPA by failing to adequately address the cumulative impacts of the Roadless Rule and three other coordinated rulemaking proceedings: the 2000 Planning Regulations, 65 Fed. Reg. 67,514 (Nov. 9, 2000); the 2001 Road Management Rule, 66 Fed. Reg. 3206 (Jan. 12, 2001); and the 2001 Transportation Policy, 66 Fed. Reg. 3219 (Jan. 12, 2001); 66 Fed. Reg. 65,796 (Dec. 20, 2001).[30] Wyoming asserts that the Forest Service's cumulative impacts analysis "did not provide needed information to the public or focus the agency's attention on the environmental consequences of its proposal, as required by NEPA." Wyo. Br. at 30. The district court, agreeing with Wyoming, concluded that the "Forest Service's final EIS does not provide an adequate discussion of the cumulative impacts of the [four coordinated

---

[30]    Briefly stated, the 2000 Planning Regulations, 65 Fed. Reg. 67,514, revised the regulations governing the development, adoption, and amendment of forest plans for the NFS; the 2001 Road Management Rule, 66 Fed. Reg. 3206, amended existing rules governing the management, use, and maintenance of the National Forest Transportation System; and the 2001 Transportation Policy, 66 Fed. Reg. 3219; 66 Fed. Reg. 65,796, governed Forest Service officials' decisions regarding the construction, reconstruction, or decommissioning of roads, among other things.

rulemakings]," and that "the Forest Service failed to make a reasonable, good faith, and objective presentation of the cumulative impacts of these rules on the environment." *Wyoming*, 570 F. Supp. 2d at 1341; *see also id.* at 1343 (stating that "the cumulative impacts analysis was woefully inadequate because [the] impacts [of those four rulemakings] are potentially significant").

On appeal, the Forest Service does not dispute that it was required to include a discussion of the cumulative impacts of the four coordinated rulemakings in the Roadless Rule FEIS. Instead, it argues that the discussion of the cumulative impacts contained in the FEIS was adequate in that it "fully disclosed . . . that the Roadless Rule was one of several coordinated rulemaking initiatives relating to NFS roads," it discussed and disclosed the cumulative impacts that "reasonably could be foreseen," and it "reasonably declined to speculate about what was 'impossible' to predict; *viz.*, where increases in unroaded areas might occur as a result of the agency's future planning and project decisions (which themselves will be subject to NEPA analysis)." Forest Serv. Opening Br. at 54, 56–57. The Forest Service argues that "[n]othing more was required." *Id.* at 57. Similarly, the Environmental Groups argue that the cumulative-impacts analysis included in the EIS was reasonable and adequate, and any "further analysis of the cumulative impacts of these three policies would have been wholly speculative because they were merely planning provisions to be applied in later forest-specific decisions." Envtl. Grps. Opening Br. at 30

73

(emphasis omitted).

Under NEPA, an EIS "must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts of 'past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.'" *Colo. Envtl. Coal.*, 185 F.3d at 1176 (quoting 40 C.F.R. § 1508.7); *see also* 40 C.F.R. § 1508.25(c) (stating that the "scope" of an EIS includes consideration of "cumulative" impacts).[31] The types of impacts that must be considered include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health [effects]." 40 C.F.R. § 1508.8. However, it is well-established that "[a]gencies only have a duty to discuss . . . the FEIS impacts that are reasonably foreseeable." *Utahns for Better Transp.*, 305 F.3d at 1176 (citing *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)). Furthermore, "[e]ven as to impacts that are sufficiently likely to occur such that they are reasonably foreseeable and

_____

[31]    The CEQ Regulations define "cumulative impact," in full, as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

merit inclusion, the FEIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project." *Id.* In reviewing the sufficiency of the Forest Service's cumulative-impacts analysis, "we must examine the administrative record, as a whole, to determine whether the Forest Service made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." *Colo. Envtl. Coal.*, 185 F.3d at 1177. Having reviewed the FEIS and the record as a whole, we conclude that the Forest Service's cumulative-impacts analysis is adequate.

In the FEIS, the Forest Service disclosed the existence of the other coordinated rulemakings and stated that the cumulative purpose of these rulemakings was to collectively "address[] management of existing roads, inventoried roadless areas, and other unroaded areas" in the NFS. FEIS at 1-6, 3-398 (disclosing the existence of and giving an overview of the final Planning Regulations and the future Transportation Policy and Road Management Rule). In the cumulative-impacts section of the FEIS, the Forest Service acknowledged "that the Roadless Rule together with the other proposed and finalized rules and policies could have cumulative effects." *Id.* at 3-396. As to the analysis of the Planning Regulations—which were enacted to "guide land management planning for the [NFS] and describe the required planning process and content of land and resource management plans," but "not [to] specify criteria or characteristics for

roadless area delineation or management," *id.* at 3-397—the Forest Service stated that "the two rules (Planning Regulations and Roadless Rule) are complementary, not additive." *Id.* The Forest Service stated that "if the two rule[s] are implemented together, it is reasonable to predict that more inventoried roadless areas would be allocated to management uses that maintain undeveloped roadless characteristics th[a]n may have been allocated by the Planning Regulations alone"; however, "[t]o what extent this would occur is not predictable since it would occur through the local decision making process." *Id.*

The cumulative-impacts analysis also discussed the Transportation Policy and Road Management Rule, which had not been promulgated at the time the FEIS was issued. Together, the rule and policy dealt with, among other things, the decommissioning of NFS roads, identification of minimum transportation needs on NFS lands, and construction of new roads or reconstruction of existing roads on NFS land (for compelling reasons only). *Id.* at 3-398. More specifically, the Road Management Rule "would change definitions and road management objectives, establish information to be contained in the road atlas (maps and inventory), and direct officials to identify the minimum transportation system needed that would best serve current and anticipated management objectives and public uses of NFS lands." *Id.* The proposed Transportation Policy would give "unneeded roads . . . decommissioning priority if they were causing environmental impacts," would "require[] a determination of a

76

compelling need for road construction and reconstruction in certain unroaded areas," and would require the establishment of a forest-wide "science-based roads analysis process" that would "help analyze effects [of road construction] to unroaded areas." *Id.* In its analysis, the Forest Service concluded that the Roadless Rule would "augment the provisions of the proposed Roads Policy that address [IRAs], since under the [Roadless Rule] construction and reconstruction in [IRAs] would be prohibited," and would cumulatively result "in better road planning and a probable decrease in road construction overall." *Id.*; *see also id.* ("The proposed Roads Policy is complementary to the proposed Roadless Rule and provides an additional level of review and analysis in certain unroaded areas of NFS lands.").

In sum, the Forest Service identified and gave an overview of the three other coordinated rulemakings and addressed the reasonably foreseeable cumulative effect of the rules—*viz.*, that they would likely result in an overall decrease in road construction and an increase in unroaded areas in IRAs. On the other hand, because the agency could not reasonably predict what specific actions and decisions would be taken under the other three rulemakings in the future, the agency declined to address the magnitude or degree of these cumulative impacts on specific NFS lands in any further detail.

The district court found this analysis "woefully inadequate." *Wyoming*, 570 F. Supp. 2d at 1343. We disagree. Collectively, the Planning Regulations,

Transportation Policy, and Road Management Rule merely established an overarching framework for evaluating future forest-specific management plans and road proposals, which generally would undergo their own NEPA evaluations. *See, e.g.*, 65 Fed. Reg. at 67,570 (codified at 36 C.F.R. § 219.6 (2000)) (stating that actions proposed under the Planning Regulations must undergo NEPA analysis). In other words, these three procedural planning rules would not have any concrete, measurable cumulative impact until the Forest Service implemented them in response to specific proposals in the future. Therefore, the precise cumulative impacts flowing from these other coordinated rulemakings were only speculative in nature; that is, they were not "reasonably foreseeable" at that time. 40 C.F.R. § 1508.7.

In general, we have not required agencies to consider "speculative" impacts or actions in an EIS, whether it be in the context of the reasonable-alternatives analysis or the reasonably foreseeable impacts of the proposed project or other projects. *See, e.g.*, *Wilderness Workshop*, 531 F.3d at 1228–31 (holding that NEPA did not require the agency to analyze the impacts of future actions that were "speculative" or not "imminent" connected actions); *Sierra Club v. Lujan*, 949 F.2d 362, 368 (10th Cir. 1991) ("NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project."). This equally holds true in the context of a cumulative-impacts analysis; that is, cumulative impacts that are too speculative

or hypothetical to meaningfully contribute to NEPA's goals of public disclosure and informed decisionmaking need not be considered. *See Safeguarding The Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 218 (1st Cir. 2011) ("For NEPA purposes, an agency need not speculate about the possible effects of future actions that may or may not ensue."); *cf. Envtl. Def. Fund, Inc. v. Andrus*, 619 F.2d 1368, 1378 (10th Cir. 1980) ("An EIS is not supposed to resolve all contentions but rather to identify them in a full disclosure sense in order to enable the decision makers to undertake informed choices.").

Therefore, although the Forest Service was right to disclose the coordinated rulemakings and acknowledge that they could have some cumulative impacts—i.e., that they likely would result in an overall decrease in road construction and an increase in unroaded areas in the NFS—it was required to include only impacts that were reasonably foreseeable.[32] Accordingly, we conclude that the Forest Service made "a reasonable, good faith, objective presentation of those [cumulative] impacts sufficient to foster public participation and informed decision making." *Colo. Envtl. Coal.*, 185 F.3d at 1177. In this instance, nothing more was required to satisfy this requirement of NEPA; the

---

[32] The Ninth Circuit rejected a virtually identical claim challenging the Forest Service's cumulative-impacts analysis in the Roadless Rule EIS. *See Kootenai Tribe*, 313 F.3d at 1123 (rejecting "the district court's conclusion that the Forest Service failed adequately to evaluate the cumulative effects of the Roadless Rule" and concluding that "the potential cumulative effects of the Roadless Rule are too speculative to be amenable to in-depth analysis in the EIS").

district court erred in holding otherwise.

### 6.    Site-Specific Analysis

Wyoming asserts that the Forest Service also violated NEPA in promulgating the Roadless Rule because it failed to conduct a "site-specific analysis" of the environmental impacts for each of the specific forest units affected by the Rule.  The district court rejected this argument and held that the Forest Service was not required under NEPA to conduct a site-specific analysis for every affected IRA.  *Wyoming*, 570 F. Supp. 2d at 1340–41 ("In the absence of a clear statutory or regulatory directive [requiring agencies to conduce a site-specific analysis], and a binding decision on point, this Court will not impose additional NEPA duties on federal agencies.").  Even though Wyoming did not cross-appeal the district court's holding on this issue, it argues on appeal that we should rule in its favor on this issue, which would provide an alternate ground for affirming the district court's ultimate holding that the Forest Service violated NEPA in promulgating the Roadless Rule.[33]  Specifically, Wyoming asserts that

---

[33]     We have jurisdiction over the site-specific analysis issue, even without a cross-appeal, because an appellee is generally permitted to "defend the judgment won below on any ground supported by the record without filing a cross appeal." *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 745 n.2 (10th Cir. 2005) (quoting *Tinkler v. United States ex rel. FAA*, 982 F.2d 1456, 1461 n.4 (10th Cir. 1992)) (internal quotation marks omitted); *see, e.g.*, *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 958 (10th Cir. 2011) ("We have held that an 'appellee may, without filing a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court.'"

(continued...)

because the EIS did not include a site-specific analysis for every individual IRA affected, the Forest Service failed to satisfy the statutory requirement that the EIS include a "detailed statement" of the environmental consequences of the proposed rule.

In preparing the EIS for the Roadless Rule, the Forest Service was required to provide a "detailed statement" regarding, among other things, "the environmental impact" of the rule and "any adverse environmental effects which cannot be avoided should the [rule] be implemented." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.16 (stating that the detailed statement should include: "environmental impacts of the alternatives . . . , any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal"). For "broad

---

[33](...continued)
(quoting *Ute Distrib. Corp. v. Sec'y of Interior*, 584 F.3d 1275, 1282 (10th Cir. 2009))); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 732 n.2 (10th Cir. 2005) (stating that "an appellee may generally, without taking a cross appeal, urge in support of a decree any matter appearing in the record"). Although Wyoming attacks the district court's rejection of its site-specific argument, it is merely claiming that this argument provides an alternative ground for affirming the district court, without seeking to enlarge its own rights or lessen the rights of others. *See, e.g.*, *Ute Distrib. Corp.*, 584 F.3d at 1282; *cf. Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1198 (10th Cir. 2010) ("A cross-appeal ordinarily would be appropriate where a litigant seeks to enlarge his rights conferred by the original judgment or to lessen the rights of his adversary under that judgment.").

Federal actions such as the adoption of new agency programs or regulations," the CEQ Regulations state that the agency "may find it useful to evaluate the proposal[] . . . [g]enerically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(c)(2). There is nothing in the statute or CEQ Regulations that requires an agency to include a site-specific analysis for every particular area affected by the proposed action. Furthermore, as the district court correctly acknowledged, "[n]either the Supreme Court nor the Tenth Circuit has ascribed to the . . . view that an agency must conduct a 'reasonably thorough' site-specific analysis under NEPA." *Wyoming*, 570 F. Supp. 2d at 1340 (quoting *California v. Block*, 690 F.2d 753, 765 (9th Cir. 1982)).

Wyoming asserts that NEPA uniformly requires an agency to prepare a site-specific analysis for every specific area affected by a proposed action, regardless of whether the agency is proposing a localized project or a broad nationwide rule. In making this argument, Wyoming cites three decisions from other circuits where an EIS was found to be insufficient for failing to assess the site-specific environmental consequences unique to each proposed action on appeal. *See Conservation Law Found. of New England, Inc. v. Gen. Servs. Admin.*, 707 F.2d 626, 629–34 (1st Cir. 1983) ("We cannot say that the district court abused its discretion or was clearly in error in requiring more detailed analysis on a site-specific basis of the environmental consequences of [the proposed agency

action].”); *Sierra Club v. Peterson*, 717 F.2d 1409, 1413–15 (D.C. Cir. 1983) (concluding that the agency was required to conduct a site-specific analysis through an EIS before it could authorize the issuance of oil and gas leases within two national forests); *Block*, 690 F.2d at 761–65 (holding that the Forest Service violated NEPA when it failed to evaluate the site-specific environmental consequences of designating several forest areas in the National Forest System as “nonwilderness” areas under the RARE II program; the court found that the site-specific analysis was required because the agency was proposing to make an “irreversible and irretrievable commitment of the availability of resources to a project at a particular site” (internal quotation marks omitted)).  However, contrary to Wyoming’s assertions, these cases do not in themselves indicate that there is a uniform nationwide requirement under NEPA that agencies prepare a site-specific analysis for every specific location affected by a broad administrative action.  Furthermore, even assuming, *arguendo*, the cases cited by Wyoming did establish such a uniform mandate under NEPA, we are not bound by the decisions of other circuit courts.  *Fed. Deposit Ins. Corp. v. Daily*, 973 F.2d 1525, 1532 (10th Cir. 1992).[34]

---

[34]     The specific case Wyoming primarily relies upon in asserting that NEPA requires the Forest Service to include a site-specific analysis for every affected area, *California v. Block*, is unpersuasive.  The *Block* case concerned a challenge to the Forest Service’s RARE II program.  Specifically, the plaintiffs in *Block* challenged the Forest Service’s allocation of several forest areas as “nonwilderness,” which meant that such areas would be “managed for purposes

(continued...)

83

We conclude that the district court did not err in holding that the Forest

Service was not required in this instance to conduct a site-specific analysis for

_____

[34](...continued)
other than wilderness preservation." *Id.* at 762. The EIS prepared by the Forest Service did not analyze the "site-specific impact of this decisive [nonwilderness] allocation decision." *Id.* at 763. The Forest Service argued that the EIS for RARE II—which was a "programmatic EIS describing the first step in a multi-step national project"—"need not contain the type of detailed site-specific information normally contained in an EIS prepared for a more narrowly focused project such as a dam or a federal mineral lease." *Id.* at 760–61. The court disagreed with the Forest Service's contention that a more general analysis was all that was required given the "national scope of [RARE II's] impact," and concluded that a site-specific analysis regarding each individual area was required before the Forest Service could irreversibly and irretrievably "commit th[o]se areas for nonwilderness uses." *Id.* at 760, 763. However, in reaching its decision, the Ninth Circuit relied primarily on the 1973 CEQ Guidelines applicable to the RARE II EIS on appeal. *See id.* at 763 & n.5 ("The prescribed content of the EIS is delineated in the [CEQ] Guidelines in effect at the time of the EIS's issuance," which "were supplanted by the CEQ Regulations adopted November 29, 1978." (citing 43 Fed. Reg. 55,990 (1978) (codified at 40 C.F.R. §§ 1500–08 (1981)))). Unlike the CEQ Regulations governing the EIS presently before the court, the 1973 Guidelines did not expressly permit an agency to "[g]enerically" evaluate "broad Federal actions such as the adoption of new agency programs or regulations." 40 C.F.R. § 1502.4(b)–(c)(2). There is also an important factual distinction between the proposed action before the Ninth Circuit in *Block* and the Roadless Rule: the challenged action in *Block* was the allocation of forest areas as "nonwilderness"—thereby opening such areas up to possible development and other uses that could lead to substantial environmental degradation—as opposed to the Roadless Rule, which generally prohibits such "nonwilderness" uses. Lastly, it is worth noting that the court's holding in *Block*, which could be read to require agencies to undertake site-specific analysis in an EIS for all areas covered by a broad nationwide rule, has been called into doubt or at least qualified by the Ninth Circuit's subsequent decision in *Kootenai Tribe*, 313 F.3d 1094. In that decision, the Ninth Circuit stated that "laws and regulations of general applicability," such as the Roadless Rule, "may properly be considered by government officials who weigh and balance the virtues and defects of any prohibition or regulation" and "do not require an evaluation of the costs and benefits of the law *at each location where it may apply*." *Id.* at 1117 n.20 (emphasis added).

84

every IRA affected by the rule. Because the Roadless Rule is a "broad" nationwide rule, the Forest Service was permitted under 40 C.F.R. § 1502.4(c)(2) to evaluate the common environmental impacts and effects of the rule "generically." In accordance with that provision, the Forest Service "generically" evaluated the common environmental impacts of the four alternatives on IRAs. *See generally* FEIS at 3-1 to 3-407 (analyzing the "affected environment and environmental consequences" of the Roadless Rule, and the general environmental impacts under each of the four prohibition alternatives).

Furthermore, in addition to this general analysis, the Forest Service actually considered some regional distinctions and site-specific aspects of the proposed Roadless Rule, including the impact of the proposed alternatives on specific forest areas and IRAs. *See, e.g.*, *id.* at 3-49 to 3-53 (analyzing the effects on "water quality and drinking water source areas," and noting distinctions in the impact on various regions, states, and specific forest areas); *id.* at 3-55 to 3-58 (analyzing the risk of "soil loss" under the proposed alternatives and indicating which regions would be most affected under the prohibition alternatives); *id.* at 3-58 to 3-62 (analyzing the correlation between landslides and land-management activities—such as road construction and timber harvesting—and noting the risk of landslides under the proposed alternatives in specific areas such as the "coastal forests of Oregon, Washington, and northern California"); *id.* at app. B ("State-by-State Summaries of Key Information for the Preferred Alternative").

Under NEPA, our role in reviewing the Forest Service's EIS "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *Utahns for Better Transp.*, 305 F.3d at 1163 (quoting *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1208 (10th Cir. 2002)) (internal quotation marks omitted). The Forest Service has adequately done so in this instance, despite the fact that it did not include a detailed site-specific analysis of the environmental consequences at each and every specific IRA affected by the rule. Accordingly, we affirm the district court's holding as to this claim.

### 7. Supplemental Environmental Impact Statement

Wyoming next claims that the Forest Service violated NEPA when it failed to prepare a supplemental EIS after making changes to the rule in the FEIS and the final rule. The district court, agreeing with Wyoming and CMA, held that the Forest Service violated NEPA when it "made four substantial changes between the draft EIS and the final EIS and did not prepare a supplemental EIS." *Wyoming*, 570 F. Supp. 2d at 1344. These "four substantial changes" include: (1) eliminating the "procedural aspects" of the rule by incorporating those procedures in the Planning Regulations; (2) "broaden[ing] the scope of the Roadless Rule to include areas with classified roads within [IRAs]"—that is, making the rule applicable to "roaded" as well as "unroaded" portions of IRAs covered by the rule; (3) "identif[ying] an additional 4.2 million acres of roadless

86

areas that would be subject to the Roadless Rule"; and (4) making a "change to the type of timber harvesting that would be allowed; specifically, . . . limit[ing] the 'stewardship exception' in the final Roadless Rule to harvesting only 'small diameter timber.'" *Id.* On appeal, the Forest Service and the Environmental Groups argue that these changes were not "substantial changes" to the proposed actions, and therefore, those changes did not trigger a duty under NEPA to prepare a supplemental DEIS or FEIS. We agree that a supplemental EIS was not required.

An agency is required to prepare a supplemental DEIS or FEIS if: (1) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or (2) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i)–(ii). The duty to prepare a supplemental EIS is based on the need to facilitate informed decisionmaking. *S. Utah Wilderness Alliance v. Norton*, 301 F.3d 1217, 1238 (10th Cir. 2002), *rev'd on other grounds and remanded*, 542 U.S. 55 (2004). "Of course, every change [to a proposed action] however minor will not necessitate a new substantive analysis and repetition of the EIS process. To make such a requirement would lead agencies into Xeno's paradox, always being halfway to the end of the process but never quite there." *New Mexico ex rel. Richardson*, 565 F.3d at 708.

Therefore, a supplemental EIS is required only if the new information or

87

changes made to the proposed action "will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Friends of Marolt Park v. U.S. Dept. of Transp.*, 382 F.3d 1088, 1096 (10th Cir. 2004) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989)) (internal quotation marks omitted). As to the latter point, even if a change made "will have a significant environmental impact, the failure to issue a supplemental EIS is not arbitrary or capricious [if] the relevant environmental impacts have already been considered" during the NEPA process. *Id.* at 1097. Furthermore, an agency is generally entitled to deference when it determines that new information or a change made to the proposed action does not warrant preparation of a supplemental EIS. *See Marsh*, 490 U.S. at 375–77 (stating that because an agency's decision whether to prepare a supplemental EIS requires "substantial agency expertise," courts must defer to the agency's "informed discretion"); *see also Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1524 (10th Cir. 1992). In this instance, we agree that the Forest Service was not required to prepare a supplemental EIS, and accordingly hold that the district court erred in concluding otherwise.

First, the Forest Service did not make a substantial change when it shifted the procedural component of the proposed Roadless Rule to the 2000 Planning Regulations. *See* FEIS at xi (stating that "[t]he procedural alternatives described in the DEIS have been removed from the FEIS because of the decision to

88

incorporate the procedures in the final Planning Regulations").  The Forest

Service initially analyzed the proposed procedural aspect, as well as the "no

action; no procedures" alternative to the proposed procedures, in the DEIS.  *See*

DEIS at S-23, 2-6 to 2-10, 3-223 to 3-225.  Thereafter, the Forest Service did not

discard those procedures, but instead moved the procedures to the 2000 Planning

Regulations.  In the FEIS, the Forest Service explained the reasoning behind this

change, stating:

> Public comments on the proposed Planning Regulations and
> Agency comments on the DEIS [for the Roadless Rule] also
> suggested that the procedures for roadless area protection were
> best suited for the Planning Regulations.  Upon review, most of
> the roadless area characteristics identified in the DEIS and
> proposed Roadless Rule were similarly required by the Planning
> Regulations.  Therefore, the Forest Service determined that the
> procedures contemplated in the Roadless Rule should be an
> explicit part of the plan revision process, and addressed them at
> [§] 36 CFR 219.9(b)(8) of the final Planning Regulations.

FEIS at 1-16; *see also id.* at 1-10 ("Since the close of the DEIS comment period

. . . , the Agency determined [the procedural] requirements were more

appropriately addressed in the [§] 36 CFR 219 Planning Regulations.  Comments

received on the DEIS about the procedures were shared with the Planning

Regulations team, and were incorporated into that rulemaking.").

After making this shift, the Forest Service fully analyzed the effects of the

procedural aspects in the 2000 Planning Regulations.  *See, e.g.*, National Forest

System Land and Resource Management Planning Regulations; Final Rule, 65

Fed. Reg. 67,514, 67,514–81 (Nov. 9, 2000). Furthermore, the Forest Service

addressed the impact of this shift as part of the cumulative-impacts analysis in the

FEIS, which revealed that the shift was not "substantial" in terms of the

"environmental concerns" of the proposed action. *See supra* Part II.C.5

(discussing the sufficiency of the Forest Service's analysis of the cumulative

impacts of, *inter alia*, the 2000 Planning Regulations and the Roadless Rule).

Under these circumstances, it cannot be said that the Forest Service acted

arbitrarily and capriciously in failing to prepare a supplemental EIS after making

this change, because shifting the procedural aspect of the proposed Roadless Rule

to the 2000 Planning Regulations was not a "substantial change[] in the proposed

action that [is] relevant to environmental concerns." 40 C.F.R.

§ 1502.9(c)(1)(i).[35]

Second, the Forest Service was not required to prepare a supplemental EIS

when it made the Roadless Rule's prohibitions applicable to "roaded" portions, in

---

[35] It is worth noting that neither Wyoming nor CMA put forth any argument on appeal in regard to the shifting of the procedural aspects to the 2000 Planning Regulations. Although "we may not neglect [an issue] simply because an appellee fails to defend adequately the district court's decision," *Hernandez v. Starbuck*, 69 F.3d 1089, 1094 (10th Cir. 1995), this court has indicated that an "appellee's brief plays a vital function in informing the court of the weaknesses in the appellant's arguments" and "[b]y failing to address a ground for relief raised by the appellant, the appellee greatly increases the chances the court of appeals will be persuaded by the appellant's position," *id.* at 1094 n.3. In this instance, we think the appellees' failure to address this issue on appeal lends support to the argument that this change in the proposed action—*viz.*, shifting the procedural aspects to the planning regulations—was not a substantial one relevant to environmental concerns, thereby requiring preparation of a supplemental EIS.

addition to "unroaded" portions, of IRAs.  As initially proposed, the prohibitions in the Roadless Rule were not intended to apply to the 2.8 millions acres of IRAs on which roads had been constructed.  *See* DEIS at S-4 (stating that of the 54.3 million acres of IRAs, "roads have been constructed in approximately 2.8 million acres . . . .  The remaining 51.5 million acres make up the 'unroaded portions of [IRAs]' discussed in the proposed rule").  In the FEIS, the Forest Service abandoned the distinction between "roaded" and "unroaded" IRAs, making the rule "appl[icable] to the entire area within the boundaries of the [IRAs], including portions that contain existing roads."  FEIS at 2-5.

The Forest Service indicated that this change was made in response to "[p]ublic comments indicat[ing] that this [roaded versus unroaded] concept was confusing and would be difficult to apply and administer consistently."  *Id.* at 2-5 n.3.  After making this change, however, the Forest Service explained that "[t]he effects analysis in the DEIS was actually based on application of the prohibitions to entire [IRAs], since data was not specific to roaded or unroaded portions.  Therefore, both the concept and the definition of 'unroaded portion' were deleted from the alternatives and analysis in this FEIS."  *Id.*  In other words, even though the proposed rule was initially only intended to apply to "unroaded" portions of IRAs, the DEIS analyzed the environmental effects and consequences of the rule as it applied to both "roaded" and "unroaded" areas.  Therefore, the Forest Service had already considered the environmental effects of this change in the

91

DEIS.

As stated above, we have held that even when an agency makes a substantial change, "the failure to issue a supplemental EIS is not arbitrary or capricious [if] the relevant environmental impacts [of that change] have already been considered" during the NEPA process. *Friends of Marolt Park*, 382 F.3d at 1096; *see also Marsh*, 490 U.S. at 374 (noting that a supplemental EIS is only required where the impacts of new information or change have not already been considered by the agency); *New Mexico ex rel. Richardson*, 565 F.3d at 705 ("When the relevant environmental impacts [of a change to the proposed action] have already been considered earlier in the NEPA process, no supplement is required." (quoting *Friends of Marolt Park*, 382 F.3d at 1096–97) (internal quotation marks omitted)). Accordingly, because the Forest Service had already considered the environmental effects of applying the Roadless Rule to both roaded and unroaded IRAs in the DEIS, it did not act arbitrarily and capriciously when it refrained from preparing a supplemental EIS after that change was made in the FEIS.

Third, the Forest Service was not required to prepare a supplemental EIS when it revised the relevant maps to include an additional 4.2 million acres in the IRAs subject to the Rule. Guided by prescriptions of the Council on Environmental Quality, we have stated that a new or different alternative does not require preparation of a supplemental EIS evaluating such a change when the

92

"new alternative is 'qualitatively within the spectrum of alternatives that were

discussed in the [DEIS].'" *New Mexico ex rel. Richardson*, 565 F.3d at 705

(quoting Forty Most Asked Questions Concerning CEQ's National Environmental

Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 17, 1981) [hereinafter

Forty Questions]); *see also In re Operation of Mo. River Sys. Litig.*, 516 F.3d 688,

693 (8th Cir. 2008) ("A substantial change that requires an SEIS under 40 C.F.R.

§ 1502.9(c)(1)(I) is one that is not 'qualitatively within the spectrum of

alternatives that were discussed' in a prior FEIS." (emphasis omitted) (quoting

*Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1292 (1st Cir. 1996))); *Dubois*,

102 F.3d at 1292 (stating that "an additional alternative that has not been

disseminated previously in a draft EIS may be adopted in a final EIS, without

further public comment, only if it is 'qualitatively within the spectrum of

alternatives that were discussed' in the prior draft; otherwise a supplemental draft

is needed" (quoting Forty Questions, 46 Fed. Reg. at 18,035)).

In the Forty Questions guidance document, which we have previously relied

upon,[36] the CEQ explains when a modified alternative addressed in the FEIS, but

not addressed in the DEIS, would be considered "qualitatively within the

spectrum of alternatives that were discussed in the draft":

---

[36]     As we stated in *New Mexico ex rel. Richardson*, "[w]e consider [the
CEQ Forty Questions Guidance] 'persuasive authority offering interpretive
guidance' regarding the meaning of NEPA and the implementing regulations."
565 F.3d at 705 n.25 (quoting *Davis*, 302 F.3d at 1125 n.17).

> If it is qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be needed. For example, a commentor on a draft EIS to designate a wilderness area within a National Forest might reasonably identify a specific tract of the forest, and urge that it be considered for designation. *If the draft EIS considered designation of a range of alternative tracts which encompassed forest area of similar quality and quantity, no supplemental EIS would have to be prepared.* The agency could fulfill its obligation by addressing that specific alternative in the final EIS.

Forty Questions, 46 Fed. Reg. at 18,035 (emphasis added). This is analogous to the situation currently at issue.

In the DEIS, the prohibitions in the preferred alternative were applicable to 54.3 million acres of IRAs, totaling 28% of the NFS. *See, e.g.*, DEIS at A-3, A-4 tbl.1, 2-3. The Forest Service indicated in the proposed rule that "[p]rior to finalizing this proposed rule, map adjustments may be made for forests and grasslands currently undergoing assessments or land and resource management plan revisions," thereby increasing or decreasing the total acreage of IRAs affected. 65 Fed. Reg. at 30,279 (proposed § 294.11). The Forest Service—after making these map adjustments—increased the "total inventoried roadless area acreage . . . from 54.3 million acres in the DEIS to 58.5 million acres in the FEIS." FEIS at 2-23; *see also id.* at 1-1 n.2 (stating that the "[58.5 million-acre] figure has been revised from the 54.3 million acres shown in the DEIS").

These additional areas identified in the FEIS embody the same characteristics as those areas identified in the DEIS—namely, pristine roadless

areas of the NFS, generally 5,000 acres or larger in size, that, for example, "support a diversity of aquatic and terrestrial habitats," FEIS at 1-1, 1-4; "provide large, relatively undisturbed blocks of habitat for a wide variety of native plants" and "threatened, endangered, proposed, . . . [and] sensitive species," *id.* at 1-1, 1-4; and "provide people with unique recreation activities," *id.* at 1-4. In other words, the additional IRAs identified in the FEIS can be reasonably characterized as "forest area[s] of similar quality and quantity" as those areas identified in the DEIS. Forty Questions, 46 Fed. Reg. at 18,035. Therefore, because of the similarities between the previously identified IRAs and the newly identified IRAs, the Forest Service did not need to prepare a supplemental EIS addressing these additional areas, but could instead address the change in the FEIS. *Id.* This is precisely what the Forest Service did through the FEIS—*viz.*, it addressed the environmental impacts of the Roadless Rule as it applied to all 58.5 million acres of IRAs. *See, e.g.*, FEIS at 2-23 (stating that it had updated the information contained in environmental analysis to reflect the increased acreage); *id.* at 3-2 ("The [IRAs] analyzed in this FEIS encompass 58.5 million acres in 120 national forests located in 38 States and the Commonwealth of Puerto Rico."). Accordingly, we conclude that the Forest Service was not required to prepare a supplemental EIS after increasing the acreage subject to the proposed rule.

Lastly, the Forest Service did not make a substantial change to the proposed "stewardship" exception to the timber-harvesting prohibition by limiting

that exception in the final Roadless Rule to harvesting "generally small diameter timber." 66 Fed. Reg. at 3273 (to be codified at 36 C.F.R. § 294.13(b)(1)).[37] The timber-harvesting prohibition and "stewardship" exception were presented and analyzed in the DEIS and FEIS under Alternative 3. *See* DEIS at 2-4; FEIS at 2-7. In analyzing Alternative 3, the Forest Service did not propose specific language for the stewardship exception—i.e., permitting only harvesting of "small diameter trees"—but instead explained the objective of the exception as

---

[37] In the final Roadless Rule, the so-called stewardship exception states:

> [T]imber may be cut, sold, or removed in inventoried roadless areas if the Responsible Official determines that one of the following circumstances exists. . . .
>
> > (1) The cutting, sale, or removal of *generally small diameter timber* is needed for one of the following purposes and will maintain or improve one or more of the roadless area characteristics as defined in § 294.11.
> >
> > > (i) To improve threatened, endangered, proposed, or sensitive species habitat; or
> > >
> > > (ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period[.]

66 Fed. Reg. at 3273 (to be codified at 36 C.F.R. § 294.13(b)(1)) (emphasis added). In the FEIS, the Forest Service had analyzed this exception under Alternative 3 to the proposed action, but had not explicitly included the language "generally small diameter timber" in the exception. FEIS at 2-7.

96

permitting the achievement of "ecological objectives, other than timber harvest, that may require vegetative manipulation such as improving forest ecosystem health, removing non-native species and replacing with native species, and improving wildlife habitat," such as "thinning overly dense stands of trees to allow fire to be safely reintroduced into the ecosystem." DEIS at 2-5; *see* FEIS at 2-7.

In the DEIS and FEIS analysis, the Forest Service indicated the "ecological objectives" furthered by the stewardship exception, such as improving forest health and reduction of fire hazard, were commonly achieved through the removal of "small diameter trees." *Compare* DEIS at 3-21 (stating that many forest areas "now have dense stands of small diameter trees and shrubs," and therefore "hav[e] a relatively lower degree of ecosystem health" and may be "vulnerable to catastrophic stand replacing wildland fires"), *with* FEIS at 3-121 (stating that under the forest-health-treatment activities permitted under Alternative 3, "[l]ess work would be done using timber sale contracts because *the smaller-diameter, lower-value trees* would likely result in fewer economically viable timber sales").[38]

---

[38] *See also* DEIS at 3-57 tbl.3-11 (indicating that the management activity of "[t]hinning of small diameter trees in the understory" in order "to reduce fire risk or to enhance old growth" was a common practice); *id.* at 3-100 (stating that fire hazard is reduced in forests "by disposing of . . . the small diameter trees"); *id.* (demonstrating that "small diameter trees" create a fire hazard in forests); *id.* at 3-109 ("Forest health treatment activities, such as

(continued...)

97

Therefore, the Forest Service was not required to prepare a supplemental EIS in response to this change in the language of the stewardship exception because it had already analyzed the effects of the exception, as that exception was adopted in the final rule. *See Friends of Marolt Park*, 382 F.3d at 1097 (holding that a supplemental EIS is not required if "the relevant environmental impacts have already been considered" during the NEPA process). Furthermore, because it is evident in the DEIS that the Forest Service analyzed the stewardship exception in terms of removal of "generally small diameter trees," this is undoubtedly an instance where a supplement was not necessary because the adopted alternative was "'qualitatively within the spectrum of alternatives that were discussed in the [DEIS],'" and, at most, was "only a 'minor variation' from those alternatives." *New Mexico ex rel. Richardson*, 565 F.3d at 705 (quoting Forty Questions, 46 Fed. Reg. at 18,035); *see also Operation of Miss. River Sys. Litig.*, 516 F.3d at 693; *Dubois*, 102 F.3d at 1292. The district court erred in finding that this change mandated a supplemental EIS.

In sum, we conclude that the changes made to the proposed action did not trigger a duty to prepare a supplemental EIS, either individually or collectively.

[38](...continued)
thinning and fuels reduction, carried out under [Alternative 3] would . . . [less often] be done using timber sale contracts because the lower values *of the smaller diameter trees removed* would likely . . . result in fewer economically viable timber sales." (emphasis added)).

The district court's conclusion to the contrary was erroneous.[39]

## 8. Predetermination

Wyoming's final argument under NEPA is that the Forest Service impermissibly predetermined the outcome of the Roadless Rule proceeding. Specifically, Wyoming asserts that the Forest Service's bias prevented it from taking a "hard look" at the environmental impacts of the Roadless Rule as required by NEPA. Although the district court noted in its opinion that the end-product of the Roadless Rule NEPA process was "predetermined" and "preordained," *Wyoming*, 570 F. Supp. 2d at 1339–40, it never decisively

---

[39]     Furthermore, the district court based its conclusion on a finding that the Forest Service made these "substantial" changes "without giving the public notice or an opportunity to comment on the changes." *Wyoming*, 570 F. Supp. 2d at 1344. To the contrary, after the publication of the FEIS, which included three of the four changes made—(1) the removal of the procedural aspects, (2) the application of the rule to "roaded" IRAs, and (3) the addition of 4.2 million acres to the IRAs—the Forest Service accepted and reviewed public comments on the FEIS for sixty days before adopting the final rule. 66 Fed. Reg. at 3248 ("Since the publication of the FEIS [in November 2000], the agency has received comments on the FEIS and the preferred alternative," which were "considered by the agency in the development of the final rule and are in the project record."); *see also Kootenai Tribe*, 313 F.3d at 1118 (stating that "members of the public had every right and ability after publication of the FEIS on November 13, 2000, to comment further before adoption of the final [Roadless] Rule on January 12, 2001"). Therefore, because the Forest Service presented these three changes to the public in its FEIS, and the public was thereafter able to comment on these changes before the adoption of the final rule, this fact further alleviated the need to prepare a separate supplemental EIS. *See Dubois*, 102 F.3d at 1293 (holding that "substantial changes from the previously proposed actions" required the agency to prepare a supplemental EIS, which the court would not have required under NEPA had the agency "present[ed] those changes to the public in its FEIS for review and comment").

concluded that "predetermination" or "bias" constituted a separate ground for relief under NEPA. *See, e.g.*, *id.* at 1339–40 ("[T]he Forest Service's preordained conception of what a roadless area would be, and its schedule for implementing the final rule, caused the Forest Service to drive the Roadless Rule through the administrative process without weighing the pros and cons of reasonable alternatives to the Roadless Rule."); *id.* at 1340 ("The alternatives section of the Roadless Rule EIS was implemented to justify the Forest Service's predetermined decision to prohibit all road construction and timber harvest in roadless areas, even if such activity was beneficial to the forest."). On appeal, Wyoming asserts that this is a separate, independent ground for affirming the district court's decision that the Roadless Rule was promulgated in violation of NEPA.[40]

In analyzing the environmental impacts of a proposed action under NEPA, agency officials are not required to be "subjectively impartial." *Forest Guardians*, 611 F.3d at 712 (quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 470 F.2d 289, 295 (8th Cir. 1972)) (internal quotation marks omitted). In fact, the CEQ Regulations expressly indicate that an "agency can have a preferred alternative in mind when it conducts a NEPA analysis." *Id.* (citing 40 C.F.R. § 1502.14(e)). However, NEPA does mandate that an agency "take a 'hard

---

[40] As with the site-specific analysis issue, we have jurisdiction over the predetermination issue, even though Wyoming did not file a cross-appeal because "an appellee may generally, without taking a cross appeal, urge in support of a decree any matter appearing in the record." *Barnhart*, 431 F.3d at 732 n.2; *see supra* note 33.

look' at the impacts of a proposed action." *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1179 (10th Cir. 2008) (quoting *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1213 (10th Cir. 1997)); *Morris*, 598 F.3d at 681 (noting that NEPA "requires . . . that an agency give a 'hard look' to the environmental impact of any project or action it authorizes"). This examination "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Forest Guardians*, 611 F.3d at 712 (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000)) (internal quotation marks omitted); *see also* 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."); *id.* § 1502.5 ("The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.").

"[I]f an agency predetermines the NEPA analysis by committing itself to an outcome, the agency likely has failed to take a hard look at the environmental consequences of its actions due to its bias in favor of that outcome and, therefore, has acted arbitrarily and capriciously." *Forest Guardians*, 611 F.3d at 713 (citing *Davis*, 302 F.3d at 1104); *see also id.* (stating that "[w]e [have] held that . . . predetermination [under NEPA] resulted in an environmental analysis that was

101

tainted with bias" and was therefore not in compliance with the statute (citing

*Davis*, 302 F.3d at 1112–13, 1118–26)).  We recently took the opportunity in

*Forest Guardians v. U.S. Fish & Wildlife Service* to clarify the "stringent standard

that must be met in order for us to conclude that an agency violated NEPA by

predetermining the outcome of its environmental analysis."  611 F.3d at 714.

Specifically, we stated that

> predetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis—which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action.

*Id.*  This "high" standard articulated in *Forest Guardians* makes clear that

"predetermination is different in kind from mere 'subjective impartiality.'"  *Id.*

(quoting *Envtl. Def. Fund*, 470 F.2d at 296).  Unlike predetermination, subjective

impartiality "does not undermine an agency's ability to engage in the requisite

hard look at environmental consequences—even though subjective impartiality

may under certain circumstances involve something resembling predetermination

and lead an agency down the road to predetermination."  *Id.* (emphasis omitted).

In the end, concluding that an agency has predetermined the outcome of its NEPA

analysis is "a conclusion that we would not and should not reach lightly."  *Id.*  In

evaluating whether an agency has predetermined the result of its NEPA analysis,

we are permitted to look to the NEPA analysis itself—for example, the DEIS or

FEIS—as well as to evidence outside of the analysis—for example, intra-agency comments, e-mail correspondence, or meeting minutes regarding the proposed action. *Id.* at 716–18.

After reviewing the record on appeal, we conclude that the Forest Service did not "irreversibly and irretrievably" commit itself to a certain outcome before it had completed its NEPA analysis. Wyoming asserts that the "Roadless Rule was a foregone conclusion—a decision made long before the public was brought into the process." Wyo. Br. at 37. In support of its claim that the Forest Service predetermined the outcome of the Roadless Rule, and therefore did "not tak[e] a hard look at the Rule's [environmental] impacts," Wyo. Br. at 38, Wyoming points to the "expedited schedule [the Forest Service] set for itself," the "insurmountable odds" that it overcame in such a short time, and the overall complexity of the rulemaking process. *Id.*

In addition, Wyoming points to the existence of several intra-agency comments made by "career Forest Service employees," *id.*—who apparently all were below the rank of political appointees—regarding the appearance of bias or predetermination. *See* Aplee. Supp. App. at 167–68 (Memorandum from Lyle Laverty, Forest Serv. Reg'l Forester, to Bill Supulski, Forest Serv. EIS Team Leader, on Internal Review and Comment on Roadless Rule DEIS (July 7, 2000)) (stating that the DEIS "appears biased" and "oversells the positive effects of the preferred alternative"); *id.* at 167 (stating that "[s]ome of the public has the

103

perception that [Vice President Al Gore's] announcement [regarding his position on timber harvests in the IRAs] reveals the final decision and, therefore, further participation and comment is meaningless"); *id.* at 244 (E-mail Correspondence between Forest Service Employees, dated July 25, 2000) (stating that Forest Service employees "will be accused (and perhaps rightfully so) of not listening to the public comments, and having [their] minds made up before any re-analysis is done for the FEIS").[41]

However, the evidence before us simply does not satisfy the stringent standard applicable to claims of predetermination under NEPA. We have generally concluded that predetermination was present only when there was concrete evidence demonstrating that the agency had irreversibly and irretrievably bound itself to a certain outcome—for example, through a contractual obligation or other binding agreement. *See Davis*, 302 F.3d at 1112–13 (holding that the agency had predetermined the outcome of the required NEPA analysis, and had

---

[41] The district court also expressed concern about the political motivation behind the Roadless Rule. *See Wyoming*, 570 F. Supp. 2d at 1345 ("In sum, there is no gainsaying the fact that the Roadless Rule was driven through the administrative process and adopted by the Forest Service for the political capital of the Clinton administration without taking the 'hard look' that NEPA required."); *id.* ("In its rush to give President Clinton lasting notoriety in the annals of environmentalism, the Forest Service's shortcuts and bypassing of the procedural requirements of NEPA has done lasting damage to our very laws designed to protect the environment."). However, Wyoming does not specifically argue in its brief that political pressure from the Clinton Administration "biased" the Forest Service in conducting its NEPA analysis. Therefore, we have no need to examine this matter further and do not do so.

104

therefore acted arbitrarily and capriciously, when the private consultant preparing the EA was contractually obligated to reach a certain environmental analytic outcome and this contractual obligation was endorsed by the agency); *Metcalf*, 214 F.3d at 1140 (detecting a NEPA violation where the evidence demonstrated that the agency had entered into a binding contractual agreement permitting a whale hunt "before the EA process began and without considering the environmental consequences thereof"; consequently, "[b]y the time the Federal Defendants completed the final EA . . . , the die already had been cast" and "[t]he 'point of commitment' to this proposal clearly had come and gone"); *cf. Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 n.2 (10th Cir. 2006) (concluding that there was no predetermination because the Forest Service "had no preexisting agreement with any user group" binding the agency to a specific outcome); *Lee*, 354 F.3d at 1240 (concluding that no predetermination occurred—despite the fact that the U.S. Air Force had entered into several contractual agreements regarding carrying out the proposed action—because those agreements either would not take effect until after the completion of the required NEPA analysis or were not executed until after the analysis was completed). Such circumstances are not present here.[42]

---

[42] To the contrary, the evidence demonstrates that the Roadless Rule in fact evolved throughout the NEPA process, which suggests that the agency had not irretrievably and irreversibly committed itself to a predetermined outcome prior to conducting its NEPA analysis. *See* U.S. Forest Serv., U.S. Dep't of

(continued...)

The cited intra-agency comments certainly are not enough to show that *the Forest Service*, as a governmental body, "irreversibly and irretrievably" committed itself to a particular outcome before it completed the NEPA analysis of the Roadless Rule. As this court stated in *Forest Guardians*, "an individual's comments remain immaterial to the predetermination analysis unless they (1) may fairly be attributed to the agency, and (2) tend to reflect the agency's irreversible and irretrievable commitment to a course of action—in contemplation of a particular environmental outcome—even *before* the requisite environmental analysis has been completed." 611 F.3d at 718 n.20. It cannot be reasonably said that the comments at issue—made by "career Forest Service employees," Wyo. Br. at 38—satisfy these two requirements. *See Forest Guardians*, 611 F.3d at 718 ("[T]he stray comments of a low-level scientist or two—no matter how vigorously expressed—would be unlikely to render fatally infirm the otherwise unbiased environmental analysis of an entire agency.").

Accordingly, because the record does not contain sufficient evidence to

[42](...continued)
Agriculture, Changes from Proposed to Final Rule (Jan. 5, 2001), http://fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5137365.pdf (enumerating the changes that had occurred from the proposed rule to the final Roadless Rule). *Compare* FEIS at xi–xiv ("Summary of Changes Between Draft and Final EIS"), *with* Part II.C.7 (discussing changes in the proposed Roadless Rule that occurred between the issuance of the DEIS and the Final Rule). In fact, and perhaps most importantly, during the NEPA process the Forest Service decided to switch the preferred alternative from Alternative 2 in the DEIS to Alternative 3 in the FEIS. *Compare* DEIS at 2-4, *with* FEIS at 2-13.

show that the Forest Service irreversibly and irretrievably committed itself to a certain outcome before the NEPA analysis was completed, and because the Forest Service otherwise complied with the mandates of NEPA, we conclude that the Forest Service indeed took a "hard look" at the environmental consequences of the Roadless Rule and therefore did not act arbitrarily and capriciously in conducting its NEPA analysis.

### D. MUSYA Claim

Although Wyoming claimed below that the Roadless Rule violated MUSYA, the district court declined to rule on that issue "[a]s the court ha[d] already found that the Roadless Rule was promulgated in violation of NEPA and the Wilderness Act." *Wyoming*, 570 F. Supp. 2d at 1350 (stating that because it was "unnecessary, . . . the Court will refrain from deciding at this time whether the Roadless Rule also violates [MUSYA]"). On appeal, Wyoming reasserts its MUSYA claim as an alternate ground for affirming the district court's decision.[43] Specifically, Wyoming makes three arguments in regard to its MUSYA claim: (1) that "[a]lthough maintenance of wilderness characteristics is consistent with MUSYA purposes, the Roadless Rule is not" because it applies a "one size fits all approach" to "over 30% of national forest lands and directs identical treatment of

---

[43] Because the record is sufficient to allow us to rule on Wyoming's MUSYA claim, we conclude that the issue is properly before us on appeal. *See Nielander v. Bd. of Cnty. Comm'rs of Republic, Kan.*, 582 F.3d 1155, 1170 (10th Cir. 2009) ("[W]e are free to affirm a district court decision on any grounds for which the record is sufficient to permit conclusions of law."); *see supra* note 33.

those lands"; (2) the rule "precludes administration of renewable resources for multiple use" in violation of MUSYA; and (3) the rule "gives no consideration to 'various resources' in 'particular areas.'" Wyo. Br. at 44. In response, the Forest Service and the Environmental Groups argue that these three arguments are without merit and that promulgation of the Roadless Rule did not violate MUSYA. We agree.

First, contrary to Wyoming's assertions, the Roadless Rule is not a "one size fits all" regulation requiring "identical treatment" of all IRAs. Although the rule does provide broad, uniform prescriptions for IRAs—through the general prohibitions on road building and commercial logging, 66 Fed. Reg. at 3272–73 (to be codified at 36 C.F.R. §§ 294.12(a), 294.13(a))—it does not compel "identical treatment" of all IRAs. The seven exceptions enumerated in § 294.12(b) and the four enumerated in § 294.13(b), allow the "Responsible Official" for each IRA to permit road building and timber cutting in a variety of situations. Application of the exceptions will permit varied managements actions and strategies depending on the particularized and localized conditions unique to each IRA.

For example, responsible officials may permit the cutting, removal, and sale of small diameter timber to occur within a particular IRA in order to "improve threatened, endangered, proposed, or sensitive species habitat" of the area or "to maintain or restore the characteristics of ecosystem composition and

structure" of the area.  66 Fed. Reg. at 3272–73 (to be codified at 36 C.F.R.

§ 294.13(b)(1)(i)–(ii)).  Road construction may also be authorized by the

Responsible Official—for example, if it is determined "that a Federal Aid

Highway project . . . is in the public interest," or if "needed to implement a road

safety improvement project," or if "needed to prevent irreparable resource

damage that arises from the design, location, use, or deterioration of a classified

road . . . [but] only if the road is deemed essential for public or private access,

natural resource management, or public health and safety."  *Id.* at 3272 (to be

codified at 36 C.F.R. § 294.13(a)(4)–(6)).  Application of these exceptions will

likewise be specific to the particular IRA in question.

Furthermore, the Roadless Rule does not prohibit the development of new

rules specific to individual IRAs through the NFMA forest-planning process,

which would be tailored to address local forest conditions.  Moreover, it leaves in

place pre-existing forest plans governing individual IRAs, at least to the extent

that they do not conflict with the Roadless Rule.  These examples demonstrate

that the Roadless Rule will not require "identical treatment" of all IRAs.  To the

contrary, it permits—through the rule's exceptions and through the NFMA forest-

planning process—individualized treatment of IRAs.[44]

Second, the Roadless Rule does not "preclude[] administration of

---

[44]    In any event, even if the Roadless Rule did in fact mandate "identical treatment" of IRAs, Wyoming cites no authority for the proposition that MUSYA prohibits common regulation of similarly situated tracts of land in the NFS.

109

renewable resources for multiple use" in violation of MUSYA. Wyoming

correctly states that MUSYA mandates that the Forest Service "develop and

administer the renewable surface resources of the national forests for multiple

use," 16 U.S.C. § 529, including "for outdoor recreation, range, timber,

watershed, and wildlife and fish purposes," *id.* § 528. However, contrary to

Wyoming's argument, the Roadless Rule fulfills this mandate; that is, the rule

conforms to the multiple-use mandate of MUSYA, including management of NFS

lands for "outdoor recreation," "watershed," and "wildlife and fish purposes."

*Id.* § 528. Although the Roadless Rule does not permit all uses specifically

identified in MUSYA—namely, "timber" purposes—this is not required under

MUSYA.

In defining "multiple use," Congress acknowledged that "some [NFS] land

will be used for less than all of the resources" identified. 16 U.S.C. § 531(a); *see*

*also id.* (stating that "multiple use" management means "making the most

judicious use of the land for *some or all* of these resources or related services"

(emphasis added)). Therefore, although the Forest Service is directed to manage

"the renewable surface resources of the national forests for multiple use," *id.*

§ 529, the agency has broad discretion to determine the proper mix of uses

permitted within those lands. *See Bergland*, 695 F.2d at 484 (describing MUSYA

as "more permissive and aspirational than mandatory"); *Perkins*, 608 F.2d at

806–07 (stating that the language found in MUSYA "can hardly be considered

110

concrete limits upon agency discretion" because it "breathe[s] discretion at every pore." (alteration in original) (quoting *Strickland*, 519 F.2d at 469) (internal quotation marks omitted)); *see also Wind River Multiple-Use Advocates v. Espy*, 835 F. Supp. 1362, 1372–73 (D. Wyo. 1993), *aff'd*, 85 F.3d 641 (10th Cir. 1996) ("Courts that have considered this issue have held that the MUSYA grants the Forest Service 'wide discretion to weigh and decide the proper uses within any area.'" (quoting *Bighole Ranchers Ass'n v. U.S. Forest Serv.*, 686 F. Supp. 256, 264 (D. Mont. 1988))); *Intermountain Forest Ass'n v. Lyng*, 683 F. Supp. 1330, 1337–38 (D. Wyo. 1988) (stating that the MUSYA places all uses and resources on "equal footing" but does not direct how such various uses should be allocated).

Wyoming argues that "multiple use cannot be seriously contemplated when access to forests is effectively cut off by the roads prohibition." Wyo. Br. at 44 (citing *Wyoming*, 570 F. Supp. 2d at 1350). However, as discussed *supra*, these multiple uses will be permitted to continue through the use of existing roads—measuring approximately 386,000 miles, 65 Fed. Reg. at 30,277—and roads built or reconstructed under any of the exceptions enumerated in the rule, as well as through measures not requiring the construction or reconstruction of roads. *See* 66 Fed. Reg. at 3249–50. Accordingly, we conclude that the Roadless Rule does not violate MUSYA's multiple-use mandate.

Lastly, we disagree with Wyoming's contention that the Forest Service failed to give "due consideration . . . to the relative values of the various

111

resources in particular areas." 16 U.S.C. § 529. In support of this argument, Wyoming relies heavily on the Forest Service's alleged "failure to take a site specific and genuinely hard look at the impacts of the Roadless Rule during the NEPA process." Wyo. Br. at 44. However, as discussed *supra*, this allegation is incorrect; we have already concluded that the Forest Service took the requisite "hard look" at the environmental impacts and consequences of the Roadless Rule during the NEPA process. This assertion therefore lends no support to the MUSYA claim.

Furthermore, a review of the record demonstrates that the Forest Service adequately considered the "relative values of the various resources" within IRAs. In promulgating the Roadless Rule, the Forest Service assessed the value of the various resources found within IRAs, including consideration of, among other things: (a) timber, *see* FEIS at 3-193 to 3-207, 3-295 to 3-308 (evaluation of timber harvests); (b) recreational uses, *see id.* at 3-207 to 3-227, 3-271 to 3-280 (evaluation of "dispersed recreation activities" and "developed and road-based recreation activities"); (c) wilderness, *see id.* at 3-237 to 3-242, 3-271 to 3-280 (evaluation of wilderness); (d) watersheds and water quality, *see id.* at 3-46 to 3-55 (evaluation or "water quantity," "water quality," "drinking water source areas," and stream "channel morphology"); and (e) wildlife and fish, *see id.* at 3-142 to 3-171 (evaluation of "biodiversity" in general, including terrestrial and aquatic habitat and animal and plant species, as well as threatened, endangered,

112

proposed, and sensitive species). We therefore cannot agree with Wyoming's argument that the Forest Service failed to give "due consideration . . . to the relative values of the various resources" within IRAs when promulgating the Roadless Rule. As stated above, the ultimate mix of uses chosen by the Forest Service after consideration of the competing resource values is largely left to agency discretion.

In sum, we find that Wyoming's arguments pertaining to the alleged violation of MUSYA are without merit. We conclude that the Forest Service did not violate MUSYA—or otherwise act arbitrarily and capriciously under MUSYA—in promulgating the Roadless Rule.

### E.    NFMA Claim

The district court also declined to rule on Wyoming's NFMA claim. *Wyoming*, 570 F. Supp. 2d at 1350. On appeal, Wyoming reasserts its NFMA claim as an alternate ground for affirming the district court's decision. Wyo. Br. at 40–43.[45] Specifically, Wyoming argues that the Roadless Rule violates NFMA because it (1) does not comply with the "one integrated plan" requirement of NFMA, in that it places restrictions on forests that are not contained in the individual forest plans; (2) redesignates 9 million acres of forest land as unsuitable for commercial timber production in violation of individual forest

---

[45]    As with the MUSYA claim, we find that this claim is properly before the court on appeal. *See supra* note 33.

113

plans; (3) did not comply with NFMA's three-month comment period; and (4) generally violates NFMA's mandate that national forests should be governed by individual forests plans, rather than a national land management prescription. Wyo. Br. at 40–43. The Forest Service and the Environmental Groups argue that the Roadless Rule, which was promulgated pursuant to the authority granted in the Organic Act and MUSYA, does not need to comply with the provisions of NFMA. Furthermore, even if NFMA is applicable, they argue that the Roadless Rule was not promulgated in violation of any of its provisions. We agree that the Roadless Rule was not required to comply with NFMA, and therefore was not promulgated in violation of the Act.

Under NFMA, "which is primarily concerned with planning," *Utah Envtl. Cong. v. Richmond*, 483 F.3d at 1131, the Forest Service is required to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System," *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1176 (quoting 16 U.S.C. § 1604(a)) (internal quotation marks omitted). Once a forest plan has been adopted for a particular forest unit, any specific project or activity authorized by the Forest Service within that unit must comply with the applicable forest plan. *See* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").

NFMA establishes both substantive and procedural requirements governing

114

the development of individual forest plans. *See id.* § 1604. For example, each forest plan must comply with MUSYA's multiple-use mandate. 16 U.S.C. § 1604(e)(1); *accord Utah Envtl. Cong. v. Richmond*, 483 F.3d at 1131 ("Because the Forest Service must account for a variety of interests, each forest plan contemplates that the forest will be used for multiple purposes, including 'outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.'" (quoting *Utah Envtl. Cong. v. Bosworth*, 443 F.3d at 737)). Forest plans and plan revisions must also be prepared in accordance with NEPA, 16 U.S.C. § 1604(g)(1), and must be made "available to the public . . . for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions," *id.* § 1604(d). Under NFMA, forest plans—that are to "be embodied in appropriate written material, including maps and other descriptive documents," *id.* § 1604(f)(2)—"shall . . . form one integrated plan for each unit of the [NFS], incorporating in one document or set of documents . . . all of the features required by this section." *Id.* § 1604(f)(1).

Because the Roadless Rule is applicable to IRAs nationwide, rather than to a specific unit of the NFS, the Forest Service promulgated the rule pursuant to the general rulemaking authority granted to it under the Organic Act, which was reaffirmed under MUSYA. The Organic Act grants the Forest Service the

115

authority to regulate the "occupancy and use" of the national forests in order "to preserve the forests thereon from destruction." 16 U.S.C. § 551. As discussed *supra*, the Organic Act gives the Forest Service broad discretion to regulate the occupancy and use of the national forests for a wide variety of purposes. *See Grimaud*, 220 U.S. 506; *Bergland*, 695 F.2d at 476; *Hymans*, 463 F.2d at 616; *see also Burlison*, 533 F.3d at 435; *Skranak*, 425 F.3d at 1217; *Block*, 708 F.2d at 758; *Weiss*, 642 F.2d at 298; *Andrus*, 580 F.2d at 605; *Mountain States Tel. & Tel. Co.*, 499 F.2d at 614; *McMichael*, 355 F.2d at 286.

The Forest Service is permitted to rely on its rulemaking authority under the Organic Act and MUSYA to resolve issues of broad, even nationwide, applicability—such as protection of IRAs—even though it is nevertheless required to engage in localized forest planning under the NFMA. *Cf. Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991) ("[E]ven if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority."). Nothing in NFMA repealed or otherwise limited the Forest Service's general authority under the Organic Act and MUSYA. In other words, although NFMA established a localized planning process for individual units of national forest, it did not take away from the Forest Service's authority, which we have already concluded exists, to issue a broad nationwide conservation rule, such as the Roadless Rule.

116

More specifically, in enacting NFMA, Congress included no expression of intent to repeal or limit the Forest Service's broad rulemaking authority under the Organic Act; in fact, NFMA does not even reference 16 U.S.C. § 551. If Congress had intended to curtail the Forest Service's broad rulemaking authority under § 551, it is assumed that it would have at least referenced that provision in some manner. *Cf. Am. Hosp. Ass'n*, 499 U.S. at 613 ("[I]f Congress had intended to curtail in a particular area the broad rulemaking authority granted in [a section of the Act], we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section."). Congress did not do so in NFMA or its legislative history. It is clear that Congress considered the Organic Act in promulgating NFMA—which is evidenced by the fact that NFMA § 13 expressly repealed a separate provision of the Organic Act—but chose not to limit or even reference 16 U.S.C. § 551 in the NFMA. *See* Pub. L. No. 94-588, § 13, 90 Stat. 2958 (1976) ("The twelfth undersignated paragraph . . . in the Act of June 4, 1897[,] . . . is hereby repealed.").[46]

---

[46] Wyoming relies on a statement in the Senate Report on the NFMA that "[w]hile planning guidelines will apply at all levels, there is not to be a national land management prescription." S. Rep. No. 94-893, at 30 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6662, 6694. However, this single statement does not evidence a clear expression of "an intent to withhold th[e] authority" granted under the Organic Act. *Am. Hosp. Ass'n*, 499 U.S. at 612. *See also Nat'l Ass'n of Home Builders*, 551 U.S. at 662 ("While a later enacted statute . . . can sometimes operate to amend or even repeal an earlier statutory provision . . . ,

(continued...)

117

As stated above, the district court did not reach Wyoming's NFMA issue in the instant case. However, in reviewing a similar challenge under NFMA to the Interim Roadless Rule—the precursor to the Roadless Rule that put in place an eighteen-month moratorium on road construction in IRAs—the same district court concluded that the Forest Service had not violated NFMA when it failed to abide by the Act's specific procedural requirements because "the Forest Service had the right to proceed via rulemaking in lieu of forest plan modification." *Wyo. Timber Indus. Ass'n v. U.S. Forest Serv.*, 80 F. Supp. 2d 1245, 1260 (D. Wyo. 2000). That is, the district court agreed with the Forest Service that it "could enact the road moratorium by rule," under the authority of the Organic Act, "thereby obviating the need to proceed under NFMA's forest planning procedures." *Id.* at 1258–59.

The Ninth Circuit, in reviewing a challenge to the Roadless Rule, came to the same conclusion. In *Kootenai Tribe*, the court stated that although "[t]here is some practical force in the contention that the Roadless Rule will override local forest-by-forest planning with regard to its intended scope," there is "nothing in [NFMA], which establishes procedures and standards for National Forest System land and resource management plans, [that] precludes national action on a

---

[46](...continued)
'repeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'" (alteration in original) (quoting *Watt*, 451 U.S. at 267)).

118

conservation issue within the power of the Forest Service." 313 F.3d at 1117 n.20. The Ninth Circuit concluded that "the general rulemaking authority of the 1897 Organic Act is sufficient to support the Roadless Rule's promulgation to achieve the objects of our National Forest System." *Id.*; *see also id.* ("Local considerations are taken into account in plans for each forest; but government, if it chooses to do so, may act more broadly.").

Accordingly, because the Roadless Rule was promulgated under the authority of the Organic Act and MUSYA, and was not otherwise governed by NFMA, the Forest Service was not required to comply with NFMA's provisions. Wyoming's NFMA claim must therefore fail.

## F.     Remedy: Permanent Injunction

The district court permanently enjoined the Roadless Rule on a nationwide basis. *Wyoming*, 570 F. Supp. 2d at 1353–55. Although the district court acknowledged that the issuance of a permanent injunction "is an extraordinary remedy," it nevertheless found that a permanent injunction was proper. *Id.* at 1353. In order to obtain a permanent injunction, a party must prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th

Cir. 2007)) (internal quotation marks omitted). We review a district court's grant of a permanent injunction for an abuse of discretion, *Accusearch Inc.*, 570 F.3d at 1201, examining its factual findings for clear error and its legal determinations de novo, *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1242 (10th Cir. 2006). "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." *Davis*, 302 F.3d at 1111 (citations omitted).

The first requirement is dispositive in this action. As discussed above, Wyoming failed to demonstrate that the Forest Service's promulgation of the Roadless Rule violated the Wilderness Act, NEPA, MUSYA, or NFMA. Thus, the district court abused its discretion in permanently enjoining the Roadless Rule on a nationwide basis because the court's action was based on the erroneous legal conclusion that Wyoming had succeeded on the merits of its claims.

## III.   CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order granting Plaintiff declaratory relief and issuing a permanent injunction, and **REMAND** the case for the district court to **VACATE** the permanent injunction.

120